883 A.2d 369

R.M., PLAINTIFF–APPELLANT, v. SUPREME COURT OF NEW JERSEY, DISTRICT XIII ETHICS COMMITTEE AND OFFICE OF ATTORNEY ETHICS, DEFENDANTS–RESPONDENTS, AND JANE DOE, DEFENDANT.

Argued May 2, 2005—Decided October 19, 2005
Amended December 22, 2005.

*Richard M. Gutman,* argued the cause for appellant.

*Carol Johnston,* Senior Deputy Attorney General, argued the cause for respondents (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Assistant Attorney General, of counsel).

*Frederick J. Dennehy,* argued the cause for amicus curiae, *New Jersey State Bar Association* (*Edwin J. McCreedy,* President, attorney).

Justice ZAZZALI delivered the opinion of the Court.

In this matter, R.M. challenges the constitutionality of *Rule* 1:20–9, which mandates that a grievance filed against an attorney remains confidential until a formal complaint is filed. She contends that the rule is an impermissible restraint on free speech because it prevents her from making truthful statements about the ethics process, including the fact that she filed a grievance. R.M. also argues that *Rule* 1:20–9 unduly suppresses criticism of the system of attorney discipline.

We agree that, as written and as applied, *Rule* 1:20–9 violates the First Amendment because it is not narrowly tailored to serve a compelling interest. We hold that a grievant may discuss publicly the fact that he or she filed a grievance, the content of that grievance, and the result of the process. Our holding applies retroactively to all grievances currently being processed by the disciplinary system. The confidentiality of concluded matters, however, shall remain in effect.

# I.

## *Background*

Plaintiff R.M. retained New Jersey attorney "Jane Doe" to represent her in a legal matter. R.M. subsequently filed a grievance against Doe with the District XIII Ethics Committee (District). The grievance form that R.M. submitted cautioned her that

[u]nder Supreme Court *Rule* 1:20–9(a), once you file this grievance form you are REQUIRED thereafter to keep all communications about this ethics matter CONFIDENTIAL during the investigation until and unless a complaint is issued and served. Only at that time does confidentiality end and the matter become public. This investigative confidentiality does not prevent you from discussing the facts underlying your grievance with, or reporting them to, any other person or agency. However, during the investigation you may not disclose the fact that you have filed an ethics grievance to persons other than members of the attorney disciplinary system, except to discuss the case with other witnesses or to consult an attorney.

During the District's investigation, Doe admitted specific acts of misconduct in connection with her representation of R.M. The District chair determined that Doe had committed minor ethical violations that would likely result in a public admonition and that Doe was therefore eligible for "diversion." Diversion is "a non-disciplinary treatment by consent for attorneys who admit they have committed 'minor' unethical conduct." *R.* 1:20 (Official Glossary of Attorney Discipline Terms). The District then informed R.M. that, although Doe had accepted diversion, "this matter remains confidential pursuant to . . . [*Rule* ] 1:20–9(a)."

R.M. subsequently sued this Court, the District, the Office of Attorney Ethics (OAE), and Jane Doe, alleging that *Rule* 1:20–9 violates the free speech provisions of the United States and New Jersey Constitutions by restricting R.M.'s ability to discuss her grievance against Doe. R.M. has indicated that if confidentiality is lifted, she intends to publicize the fact that she filed the grievance, that the chair of the District determined that there was "a reasonable prospect of a finding of misconduct by clear and convincing evidence," and that Doe admitted to minor unethical conduct and entered into a diversion agreement. In particular,

R.M. seeks to announce this information at a public meeting of the governmental body on which Doe serves and in other public forums.

Pursuant to *Rule* 2:12–1, we certified this matter directly to determine whether *Rule* 1:20–9 is unconstitutional. The State, represented by the Attorney General, submitted a brief on behalf of the Court, the OAE, and the District. The New Jersey State Bar Association (NJSBA) participated as amicus curiae. During the pendency of the litigation, we requested that the Professional Responsibility Rules Committee (PRRC) review the issues raised by the parties, solicit comments from other interested persons and groups, and submit findings to the Court. The PRRC submitted a memorandum and summary letter, in which it recommended that investigations should remain confidential until completed. Although not part of the submission, PRRC also proposed that if the Court limits the scope of the confidentiality requirement, then the Court should eliminate absolute immunity for grievants.

## II.

Before addressing the constitutionality of *Rule* 1:20–9, we begin with an overview of the attorney disciplinary system in New Jersey.

## A.

### *General Attorney Discipline Procedures*

■ This Court has both the authority and obligation to oversee the discipline of attorneys admitted to the New Jersey Bar. *N.J. Const.* art. 6, § 2, ¶ 3; *see also R.* 1:20–1(a) ("Every [New Jersey] attorney ... shall be subject to the disciplinary jurisdiction of the Supreme Court...."). We exercise our authority through the OAE, the Disciplinary Review Board (DRB), the Disciplinary Oversight Committee, the District Ethics Committees, and the fee arbitration committees. *R.* 1:20–1(a). The overarching goal of the disciplinary system "is to protect the public from unfit lawyers

and promote public confidence in our legal system." *In re Gallo,* 178 *N.J.* 115, 122, 835 *A.*2d 682 (2003).

A grievance against an attorney is handled at the initial stage by a District Ethics Committee secretary. *R.* 1:20–3(d). The secretary must evaluate "all information received by inquiry, grievance or from other sources alleging attorney unethical conduct or incapacity." *R.* 1:20–3(e)(1). The secretary dockets the grievance if the allegations, assuming they are true, amount to misconduct. *Ibid.* Once a matter is docketed, a member of a District Ethics Committee is assigned to investigate. *R.* 1:20–3(g)(1). At the conclusion of the initial investigation, the investigator must provide a written report, including a recommendation, to the chair of the District Ethics Committee. *R.* 1:20–3(h). The chair must then determine whether there is a "reasonable prospect of a finding of unethical conduct by clear and convincing evidence."[1] *R.* 1:20–4(a); *see also R.* 1:20–3(h). If there is not, the matter is dismissed, and the facts and reasons for dismissal are provided to the respondent attorney, the grievant, and the Director of the OAE. *R.* 1:20–3(h). On the other hand, if the chair concludes that evidence supports a finding that the respondent attorney committed unethical conduct, then the chair must classify the attorney's actions as either "minor unethical conduct" or "unethical conduct." *R.* 1:20–3(i)(1).

"Minor unethical conduct" involves actions by the respondent attorney that, if proven, "would not warrant a sanction greater than a public admonition." *R.* 1:20–3(i)(2)(A). Upon such a finding, the District Ethics Committee chair may request that the OAE Director divert the matter and approve an agreement in lieu

---

[1] The parties refer to this determination as a finding of "probable cause." Later in this opinion, we reference cases from other jurisdictions with court rules substantially similar to ours that also speak in terms of "probable cause" to file disciplinary charges. *See Doe v. Sup.Ct.,* 734 *F.Supp.* 981, 985 (S.D.Fla. 1990); *Doe v. Doe,* 127 *S.W.*3d 728, 736 (Tenn.2004). To remain consistent, and for brevity's sake, we consider a finding of probable cause to be synonymous with a "reasonable prospect of a finding of unethical conduct by clear and convincing evidence," *R.* 1:20–4(a), for the purposes of this appeal.

of discipline. *R.* 1:20–3(i)(2)(B)(iii). The agreement may impose certain conditions on the respondent attorney, including "reimbursement of fees or costs, completion of legal work, participation in [an] alcohol or drug rehabilitation program, psychological counseling or satisfactory completion of a course of study." *Ibid.* Fulfillment of the terms of the agreement will result in dismissal of the ethics matter. *Ibid.* If the attorney fails to comply with the agreement, the matter will be reinstated and processed as "unethical conduct." *R.* 1:20–3(i)(2)(C). The chair of the District Ethics Committee notifies the grievant that the matter has been diverted, and the grievant may submit comments to the Director. *R.* 1:20–3(i)(2)(B)(i). The existence and substance of the diversion agreement remain confidential. *R.* 1:20–9(a).

"Unethical conduct" involves a more serious breach of attorney ethics, such as when the respondent attorney commits a crime or an act involving dishonesty, fraud, or deceit; takes action that could result in substantial prejudice to a client or other person without restitution by the attorney; or knowingly misappropriates funds. *R.* 1:20–3(i)(2)(A). Unless the respondent attorney agrees to discipline by consent, a formal complaint is issued by either the District Ethics Committee or the OAE Director. *R.* 1:20–3(i)(3)(B); *R.* 1:20–4. A three-member panel then conducts public hearings, *R.* 1:20–6(a)(1), (c)(2)(F), after which the panel may dismiss the complaint, recommend an admonition, or recommend more severe discipline, *R.* 1:20–6(c)(2)(E). If the panel recommends discipline, the matter is referred to the OAE Director for transmittal to the DRB. *R.* 1:20–6(c)(2)(E)(ii), (iii). The DRB reviews any appeals and recommendations for discipline, *R.* 1:20–15(e), (f), and makes specific determinations on the appropriate sanctions to be imposed, including suspensions, censures, reprimands, and admonitions, *R.* 1:20–15A(a)(2) to (6). When the DRB concludes that disbarment is warranted, it must present the matter to the Supreme Court as a recommendation. *R.* 1:20–16(a). Finally, in addition to the consideration of recommendations for disbarment, the Court may review all other DRB determinations. *R.* 1:20–16(b).

## B.

### *Confidentiality Under Rule 1:20–9*

We now briefly summarize the confidentiality provisions at issue in this appeal. *Rule* 1:20–9 requires that all participants in a disciplinary proceeding, including disciplinary officials and employees, maintain the confidentiality of all grievances that do not result in the filing of formal complaints, including matters that are diverted or dismissed. *R.* 1:20–9(a), (h). There are five exceptions to the confidentiality rule: (1) the respondent attorney has waived or breached confidentiality; (2) "the proceeding is based on allegations of reciprocal discipline, a pending criminal charge, or a guilty plea or conviction of a crime;" (3) there is a need to notify a person or organization in order to protect the public, the administration of justice, or the legal profession; (4) this Court has granted an "emergent disciplinary application for relief;" or (5) the matter has become "common knowledge to the public." *R.* 1:20–9(a)(1) to (5). The parties concede, and we agree, that none of these exceptions apply in this matter.

*Rule* 1:20–9(a) also mandates that "all written records received and made pursuant to [the disciplinary] rules shall be confidential." The rules specify that "public records" of an attorney's discipline are to include a complaint, a motion for final or reciprocal discipline, or the approval of a motion for discipline by consent, as well as all documents and records filed subsequently. *R.* 1:20–9(c)(1). Those records are made available for public inspection once a formal complaint is filed against the respondent attorney. *Ibid.*

## III.

With that summary of the attorney disciplinary process as our cynosure, we now examine First Amendment principles and case law that address the constitutionality of confidentiality rules in the context of professional disciplinary systems.

## A.

■ The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." *U.S. Const.* amend. I. The Free Speech Clause is applicable to the states through the Fourteenth Amendment. *Bigelow v. Virginia,* 421 *U.S.* 809, 811, 95 *S.Ct.* 2222, 2227, 44 *L.Ed.*2d 600, 605 (1975); *see also Township of Pennsauken v. Schad,* 160 *N.J.* 156, 176, 733 *A.*2d 1159 (1999) (holding protections of New Jersey Constitution's free speech clause co-extensive with First Amendment). Far from safeguarding only profound statements on topics of great import, the First Amendment protects "[a]ll ideas having even the slightest redeeming social importance." *Roth v. United States,* 354 *U.S.* 476, 484, 77 *S.Ct.* 1304, 1309, 1 *L.Ed.*2d 1498, 1507 (1957).

■ Although the protection of speech is not absolute, *City Council of L.A. v. Taxpayers for Vincent,* 466 *U.S.* 789, 812, 104 *S.Ct.* 2118, 2132, 80 *L.Ed.*2d 772, 791 (1984), laws that punish the dissemination of truthful information are generally presumed to be constitutionally infirm, *Smith v. Daily Mail Publ'g Co.,* 443 *U.S.* 97, 102, 99 *S.Ct.* 2667, 2670, 61 *L.Ed.*2d 399, 404 (1979). To sustain government proscription of the publication of truthful speech, the State has the burden of demonstrating that the law furthers a compelling interest. *First Nat'l Bank of Boston v. Bellotti,* 435 *U.S.* 765, 786, 98 *S.Ct.* 1407, 1421, 55 *L.Ed.*2d 707, 724 (1978). Moreover, even if the regulation of speech advances a compelling interest, the State must also show that the regulation is narrowly tailored to achieve that interest. *Shelton v. Tucker,* 364 *U.S.* 479, 488, 81 *S.Ct.* 247, 252, 5 *L.Ed.*2d 231, 237 (1960).

## B.

■ Guided by that background law, several courts have addressed whether the confidentiality provisions of judicial and attorney disciplinary systems violate the Free Speech Clause.

The United States Supreme Court held unconstitutional, as applied to the news media, a state law that criminally punished

anyone who disclosed information about judicial ethics proceedings. *Landmark Commc'ns, Inc. v. Virginia,* 435 *U.S.* 829, 98 *S.Ct.* 1535, 56 *L.Ed.*2d 1 (1978). In *Landmark, supra,* a Virginia newspaper published an accurate article reporting that a state judge was the subject of a pending disciplinary investigation. *Id.* at 831, 98 *S.Ct.* at 1535, 56 *L.Ed.*2d at 6. The newspaper was subsequently convicted under a Virginia statute making it unlawful to identify any judge who was the subject of an investigation by the state commission. *Ibid.* The newspaper challenged the law, claiming that the statute violated the First Amendment. Virginia argued that maintaining the confidentiality of the judicial disciplinary system was a compelling interest because investigations of misconduct would be impeded and the reputation of judges unjustly discredited if accusations of judicial wrongdoing were permitted to circulate among the public. *Id.* at 840, 98 *S.Ct.* at 1542, 56 *L.Ed.*2d at 11. The State further contended that criminal sanctions were the only way to ensure that "the guarantee of confidentiality is more than an empty promise." *Ibid.*

The Supreme Court disagreed. Although acknowledging that the State had "an interest" in protecting the reputations of judges, the Court emphasized that that interest did not justify "repressing speech that would otherwise be free." *Id.* at 841–42, 98 *S.Ct.* at 1543, 56 *L.Ed.*2d at 12 (quoting *N.Y. Times Co. v. Sullivan,* 376 *U.S.* 254, 272–73, 84 *S.Ct.* 710, 722, 11 *L.Ed.*2d 686, 702 (1964)). To the contrary,

[t]he assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion.... [A]n enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

[*Ibid.* (quoting *Bridges v. California,* 314 *U.S.* 252, 270–71, 62 *S.Ct.* 190, 197, 86 *L.Ed.* 192, 207 (1941)).]

The Court recognized that greater public scrutiny of the courts, not less, served to guard against "the miscarriage of justice," and that the frank and open discussion of judicial conduct was precisely the type of speech that "the First Amendment was adopted to protect." *Id.* at 839, 98 *S.Ct.* at 1541–42, 56 *L.Ed.*2d at 11

(internal quotation marks omitted). Although the Court in *Landmark* noted that its decision was limited to the specific issue before it, third-party confidentiality, we are persuaded that the Court's analysis is equally applicable to grievant confidentiality.

In a recent trilogy of cases, courts invalidated or modified state attorney ethics confidentiality rules because the rules were not narrowly tailored to achieve a compelling interest. *See Doe v. Sup.Ct.,* 734 *F.Supp.* 981 (S.D.Fla.1990); *Doe v. Doe,* 127 *S.W.*3d 728 (Tenn.2004); *Petition of Brooks,* 140 *N.H.* 813, 678 *A.*2d 140 (1996). In *Doe v. Supreme Court, supra,* a grievant challenged a court rule that imposed confidentiality in respect of Florida's attorney disciplinary system at all times. 734 *F.Supp.* at 983. The State asserted that confidentiality promoted the filing of complaints and encouraged witnesses to cooperate, but the court disagreed:

> Why a complainant would be more inclined to file a grievance against his lawyer, with the knowledge that he is thereby forever barred from speaking publicly about the grievance, is unclear. Indeed, it is just as likely that potential claimants would be dissuaded from initiating disciplinary proceedings if they reasonably believed that filing a petition ... would subject them to a perpetual bar from speaking out about the grievance. Thus, an equally compelling assertion can be made that the effect of [the confidentiality rule], along with the attendant threat that violators of the rule will be held in contempt of court, may actually serve to discourage the filing of complaints, surely a result not in harmony with the regulations' intended purpose.
> [*Id.* at 985.]

The court, citing *Landmark,* also rejected the State's argument that protecting the reputation of attorneys was a compelling interest: "If maintaining the reputation of the judiciary as an abstract end is insufficient to justify encroaching upon the robust exercise of free speech, then *maintaining the reputation of lawyers or the Bar is ... equally insufficient." Id.* at 986 (emphasis added). Finally, the State maintained that confidentiality was required to protect the investigatory process. *Id.* at 987. Although the court acknowledged that protecting ongoing investigations was "surely worthy," it was troubled by the confidentiality rule's "sweep and breadth" because public discussion remained stifled even after a claim was found to have merit. *Ibid.*

In *Doe v. Doe, supra*, the Supreme Court of Tennessee rejected similar arguments made in support of a confidentiality provision that applied to the entire state attorney ethics process—"complaint, investigation, hearing and judgment." 127 *S.W.*3d at 732. The State advanced three interests that it considered compelling: protection of attorney reputations, preservation of grievant and witness privacy, and safeguarding of pending proceedings. *Id.* at 733. The court, however, concluded that even if any of these interests were deemed compelling, the rule was not narrowly tailored because it precluded speech about meritless and meritorious complaints alike. *Id.* at 736.

The New Hampshire Supreme Court, in *Brooks, supra*, overturned a court rule that prevented the disclosure of information about disciplinary proceedings. 678 *A.*2d at 142–43. The court disposed of justifications such as preservation of lawyer reputations and protection of investigative integrity by concluding that the rule was overbroad. *Id.* at 144–45. The State further argued that the rule served interests in "preserving informal discipline" and in encouraging the resignation of investigated attorneys. *Id.* at 144. The court, however, concluded that any gain in efficiency or attorney cooperation resulting from those outcomes was "not sufficiently compelling to justify restriction of a complainant's fundamental right to free expression." *Id.* at 145.[2]

---

[2] We note that fifteen states, including New Jersey, explicitly require grievants to preserve confidentiality. *See N.J. Ct. R.* 1:20–9(a), (h); *Ala. R. Discip. Proc.* 30(a), (c); *Alaska Bar R.* 22(b); *Ark. R. Prof'l Conduct* § 6A(3); *Del. Laws.' R. Discip. Proc.* 13(g); *Idaho Bar Comm'n R.* 521(a)(1); *Iowa Code Ann. R.* 35.7; *La. Sup.Ct. R.* 19 § 16I; *Md. R.* 16–723(f)(2); *Miss.Code Ann.* § 73–3–343; *Mont. Law. Discip. Enforcement R.* 20(D); *Nev. Sup.Ct. R.* 121; *S.D. Codified Laws* 16–19–99; *Tex.R. Discip. Proc.* 2.16E; *Utah R. Law. Discip. & Disability* 15(i). In contrast, sixteen other jurisdictions either expressly exempt grievants from the confidentiality rule or provide that the rule applies only to disciplinary officials. *See* 17A *Ariz.Code Ann. Sup.Ct. R.* 70(a); *Colo. Ct. R. Ann.* 251.31(a), (b); *Fla. Stat. Ann. Bar R.* 3–7.1; *Ga. State Bar R.* 4–221(d)(3); *Kan. Discip. R.* 222(d); *Ky. Sup.Ct. R.* 3.150(8); *Me. Bar R.* 7.3(k)(1); *Mass Sup. Jud. Ct. R.* 4:01 § 20(1)(c); *N.Y. 1st Dep't Ct. R.* § 605.24; *N.D. Law. Discip. R.* 6.1(A); *Ohio Sup.Ct. R. Gov't Bar* 5 § 11(E)(2)(a); *Or.Rev.Stat. Bar R.* 1.7; *S.C.App.Ct. R. Law.*

## IV.

### *Constitutionality of Rule 1:20–9*

We now address whether *Rule* 1:20–9 violates the First Amendment. The parties and amicus agree that the rule is a content-specific restriction on speech because it prohibits comment on a particular topic, that is, a given disciplinary matter and the associated written records. Therefore, the State bears the burden of demonstrating that the rule is necessary to serve a compelling interest and that it is narrowly tailored to achieve that end.

### A.

The State argues that maintaining confidentiality in disciplinary proceedings until the filing of a formal ethics complaint furthers three compelling interests: (1) protecting the reputations of lawyers who are unfairly accused of wrongdoing; (2) encouraging attorneys who have committed minor misconduct to agree to diversion; and (3) preserving the integrity of the disciplinary system and its investigative process. We address each argument below.

### *Protection of Attorneys' Reputations*

It is undisputed that an attorney's reputation is his or her currency. A client's decision to retain a lawyer is based predomi-

---

*Discip. Enforcement* 12(b); *Tenn. Sup.Ct. R.* 9 § 25.5; *Vt. Ct. R. Prof'l Resp. Program* 12A; *Wyo. R. Discip. Code* § 5(a).

In the remaining jurisdictions, rules of attorney discipline do not specify which participants are obligated to maintain confidentiality. *Cal. Ann. Bus. & Prof'l Code* 6086.1(b); *Conn. Practice Book* § 2–35(c)(ii); *D.C. Bar R.* 11 § 17(a); *Haw. Sup.Ct. R.* 2.22(a); *Ill. Stat. Ann. Sup.Ct. R.* 766(a); *Ind.Code Ann. Admission & Discip. R.* 23 § 22(a); *Mich. Ct. R.* 9.126(A); 52 *Minn. R. Prof'l Resp.* 20(a); *Mo. Sup.Ct. R.* 5.31(b); *Neb. Discip. R.* 18(A); *N.H. R. Sup.Ct.* 37(21)(a); *N.M. Discip. R.* 17–304A; *N.Y.2d Dep't Ct. R.* § 691.4(j); *N.Y.3d Ct. R.* § 806.4(c)(5); *N.Y. 4th Dep't Jud. L.* § 90; *N.C. State Bar Council R.* subch. 1B, § B.0129(a); *Okla. Stat. Ann.* tit. 5, ch. 1, app. 1–A, *R.* 5.7; *Pa. R. Discip. Enforcement* 402(a); *R.I. Sup.Ct. R.* 21; *Va. R. Sup.Ct.* pt. 6, § IV, ¶ 13(N)(1); *Wash. Ct. R. Law. Conduct* 3.1(a); *W. Va. R. Law. Discip. Proc.* 2.6; *Wisc. Sup.Ct. R.* 22.40(1).

nantly, if not exclusively, on the lawyer's good professional standing. Because of the nature of the practice of law, even the finest lawyers are bound to draw the ire of clients who are dissatisfied with the course of the representation or the outcome of a matter. Accordingly, it is understandable that the State, the OAE, and the NJSBA propose that the protection of attorneys from unfounded accusations of misconduct is a compelling interest.

Although we are sympathetic to the plight of attorneys whose reputations are sullied, preventing reputational injuries "is an insufficient reason 'for repressing speech that would otherwise be free.' " *Landmark, supra,* 435 *U.S.* at 841–42, 98 *S.Ct.* at 1543, 56 *L.Ed.*2d at 12 (quoting *N.Y. Times, supra,* 376 *U.S.* at 272–73, 84 *S.Ct.* at 722, 11 *L.Ed.*2d at 702); *see also Doe v. Sup.Ct., supra,* 734 *F.Supp.* at 988 (expressing doubt that "suppression of truthful criticism of lawyers would somehow enhance or protect the reputation of the Bar"). Even if safeguarding the good repute of lawyers was sufficiently compelling, *Rule* 1:20-9 is not narrowly tailored because it sweeps in far more speech than is necessary to achieve that objective when it punishes discussion of grievances found to have merit. *See Doe v. Doe, supra,* 127 *S.W.*3d at 734–35 ("[A] confidentiality provision precluding the disclosure of both frivolous and non-frivolous complaints is not sufficiently narrowly tailored. . . .").

The State further contends that even if speech about meritorious grievances cannot be restrained, meritless complaints deserve no such protection. According to the State, "[p]ublication of grievances that are dismissed or unsubstantiated does not serve the purpose of protecting potential clients of the charged attorney, since the attorney has not been found to have acted unethically." To the contrary, if an attorney is cleared of unethical conduct, then his or her interest in suppressing the existence of an accusation is greatly diminished. *Cf. Butterworth v. Smith,* 494 *U.S.* 624, 632, 110 *S.Ct.* 1376, 1381, 108 *L.Ed.*2d 572, 581–82 (1990) (stating that grand jury secrecy is no longer necessary once targeted individual has been exonerated). Indeed, revelation that the

grievance was baseless should in most cases reassure clients and the public that the attorney did nothing wrong. *Cf. N.Y. Times, supra*, 376 *U.S.* at 279 n. 19, 84 *S.Ct.* at 729 n. 19, 11 *L.Ed.*2d at 706 n. 19 ("[T]he clearer perception and livelier impression of truth [is] produced by its collision with error." (internal quotation marks omitted)).

The current rules, however, bar the grievant from ever discussing a dismissal of his or her grievance. Shielding dismissed grievances behind a permanent wall of silence does less to "enhance respect" for the legal profession and the ethics process than it does to "engender resentment, suspicion, and contempt." *Landmark, supra*, 435 *U.S.* at 842, 98 *S.Ct.* at 1543, 56 *L.Ed.*2d at 12 (quoting *Bridges, supra*, 314 *U.S.* at 270–71, 62 *S.Ct.* at 197, 86 *L.Ed.* at 207). We conclude, therefore, that even when the ethics authorities deem a grievance to be meritless, the grievant has the constitutional right to discuss and disagree with the determination of those authorities.

### Encouragement of Diversion

According to the State, *Rule* 1:20–9 advances the "salutary goals" of resolving minor ethical matters through diversion in lieu of further disciplinary proceedings. We recognize the value of encouraging attorneys to cooperate with an investigation, remedy past harm, and take measures to prevent a future lapse of judgment or competence. However, the State's interest in achieving a matter's speedy resolution does not justify infringing a grievant's free exercise of truthful speech. *Brooks, supra*, 678 *A.*2d at 145. The goal of the disciplinary system—protecting the public from unethical attorneys—is not served by suppressing accurate statements about actual misconduct, even if minor. Furthermore, a broad reading of the rule would preclude a grievant from publicly expressing his or her belief that the disciplinary system treated the respondent attorney's misconduct too lightly. Criticism of such a quasi-governmental body is entitled to the "widest room for discussion [and] the narrowest range for its restriction." *State v. Miller*, 83 *N.J.* 402, 412, 416 *A.*2d 821 (1980)

(quoting *Thomas v. Collins*, 323 *U.S.* 516, 530, 65 *S.Ct.* 315, 323, 89 *L.Ed.* 430, 440 (1945)).

## Integrity of Pending Investigations

The State also asserts that confidentiality helps guarantee the integrity of pending investigations by encouraging the cooperation of witnesses, enabling a "full and thorough review of the matter," and promoting the filing of grievances. To accomplish those objectives, the State insists that a grievant cannot be permitted to disclose that he or she filed a grievance. We disagree. Although undoubtedly legitimate interests, they are not sufficiently compelling to justify restricting grievants' speech. Further, even if those interests could be considered compelling, *Rule* 1:20–9 is not narrowly tailored to achieve them.

We first consider the claim that maintaining confidentiality encourages witnesses to fully cooperate with ongoing investigations. The State argues that secrecy in ethics proceedings is a compelling interest because, like grand jury secrecy, it promotes "free and untrammeled disclosures" by witnesses. *United States v. Rose*, 215 *F.*2d 617, 628–29 (3d Cir.1954). However, the justifications for grand jury secrecy are simply not present in a disciplinary investigation. Grand jury proceedings are kept secret from a suspect in order to prevent him or her from fleeing and to protect witnesses from intimidation or bribes. *Douglas Oil Co. of Cal. v. Petrol Stops NW*, 441 *U.S.* 211, 219, 99 *S.Ct.* 1667, 1673, 60 *L.Ed.*2d 156, 165 (1979). In an ethics proceeding the respondent attorney is notified that allegations of unethical conduct have been reported, *R.* 1:20–3(g)(2), is informed of the substance of that grievance, *ibid.*, and is generally entitled to the identity and contact information of the grievant and potential witnesses, *R.* 1:20–5(a)(2)(D). The attorney also may obtain copies of any witness statements and summaries thereof. *R.* 1:20–5(a)(2)(B). Thus, from the outset, the respondent attorney knows what the charges are, who made them, and who can corroborate them.

Furthermore, the scope of grand jury secrecy is narrower than the confidentiality provision in *Rule* 1:20–9. In the grand jury

context, the obligation to keep an investigation secret extends only to the prosecutor, the grand jurors, and court staff. *R.* 3:6–7. A crime victim who makes a report to the police is not required to keep that fact confidential, and witnesses who appear before the grand jury are not prohibited from discussing the content of their own testimony. *Ibid.; see also United States v. Sells Eng'g, Inc.,* 463 *U.S.* 418, 425, 103 *S.Ct.* 3133, 3139, 77 *L.Ed.*2d 743, 753 (1983) (explaining that under analogous federal rule, witnesses are generally not prohibited from disclosing their own testimony). In contrast, under *Rule* 1:20–9(a) and (h), "all participants," including grievants, are barred from divulging that a grievance has been filed and that an investigation is underway. Such a prohibition not only exceeds the extent of secrecy traditionally afforded grand jury hearings, but is uniquely broad among the State's other systems of professional discipline. In New Jersey, over seventy professions are subject to regulation, but, as the State acknowledges, only persons who file ethics charges against attorneys are prohibited from discussing their grievances. *Compare R.* 1:20–9, *with N.J.S.A.* 45:1–1 to –27.

Even assuming that encouraging witnesses to cooperate with disciplinary authorities is a compelling interest, *Rule* 1:20–9 is not narrowly tailored to achieve that end. As the Supreme Court recognized in *Landmark, supra,* the risks associated with premature disclosure of an investigation can be largely "eliminated through careful *internal* procedures" that protect confidentiality. 435 *U.S.* at 845, 98 *S.Ct.* at 1545, 56 *L.Ed.*2d at 14 (emphasis added). At a minimum, we can and do require disciplinary authorities themselves to keep the existence and substance of an investigation secret, *see R.* 1:20–9(h), and nothing in the First Amendment prevents us from imposing this obligation, *see Pickering v. Bd. of Educ.,* 391 *U.S.* 563, 568, 88 *S.Ct.* 1731, 1734, 20 *L.Ed.*2d 811, 817 (1968) ("[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."). And, although we recognize that voluntary cooperation by witnesses is desirable, their testimony

can be secured by means that are less restrictive of a grievant's speech. For example, as with grand jury investigations, a subpoena can be issued to compel the appearance of a reluctant witness. *R.* 1:20–3(g)(6); *see also Butterworth, supra,* 494 *U.S.* at 634, 110 *S.Ct.* at 1382, 108 *L.Ed.*2d at 582 ("[S]ubpoena and contempt powers [are] available to bring recalcitrant witnesses to the stand."); *Doe v. Doe, supra,* 127 *S.W.*3d at 736 (concluding that because subpoenas are available, "guarantee of confidentiality has little additional effect"). Further, all witnesses appearing at disciplinary hearings are duly sworn, *R.* 1:20–6(c)(2)(A), providing reasonable assurance that they will testify "fully and frankly," *Douglas Oil, supra,* 441 *U.S.* at 219, 99 *S.Ct.* at 1673, 60 *L.Ed.*2d at 165. *See also Butterworth, supra,* 494 *U.S.* at 633, 110 *S.Ct.* at 1382, 108 *L.Ed.*2d at 582 (stating that perjury laws eliminate need for speech-restrictive rules intended to promote truthful testimony).

The State further argues that confidentiality protects the ability of disciplinary authorities to make a full and fair investigation—an objective that overlaps substantially with the interest in promoting witness cooperation. Certainly, disclosure that an investigation is ongoing has the potential to invite the exertion of outside influence. However, that possibility is speculative. In any event, the risk of coercion can be minimized by the same procedures that ensure witness cooperation: the use of subpoenas and the imposition of criminal sanctions for witness tampering, destruction of evidence, and attempts to unduly pressure officials. *See ibid.*

Finally, the State asserts that encouraging persons to file grievances is a compelling interest that is furthered by investigative confidentiality. To be sure, the reporting of attorney misconduct is of extreme importance for both the protection of the public and the success of the legal system. And, as a general rule, a grievant will be more likely to report unethical conduct by an attorney if disciplinary authorities are prohibited from revealing publicly the grievant's identity or the substance of the grievance. However, imposing on grievants the same obligation of nondisclo-

sure provides little, if any, added benefit. "The lawyer who may be the target of the complaint surely will learn about the grievance and the identity of the complainant, whether the procedures are deemed confidential or not." *Doe v. Sup.Ct., supra,* 734 *F.Supp.* at 985. Furthermore, as this matter demonstrates, not all grievants desire anonymity, and indeed, some grievants may be deterred from filing ethics complaints because they are forbidden from publicizing that fact. *See ibid.* (noting that "perpetual bar from speaking out about [a] grievance" may actually discourage filing of grievances). A more narrowly drawn rule would encourage, rather than require, grievants to preserve confidentiality. *See ibid.; Brooks, supra,* 678 *A.*2d at 145. In that way, a grievant who wishes to avoid public attention can curtail his or her own speech, free from government encroachment. *Cf. Butterworth, supra,* 494 *U.S.* at 633, 110 *S.Ct.* at 1382, 108 *L.Ed.*2d at 582 (holding that interest in protecting grand jury witnesses from retribution is not advanced by prohibition against witness discussion of own testimony; "any witness is free *not* to divulge his own testimony").

## B.

We conclude that *Rule* 1:20–9, as written and as applied, violates the First Amendment because it is not narrowly tailored to advance a compelling interest. Protecting the reputations of attorneys and the bar does not justify restricting a grievant's speech, and, in fact, such restrictions breed resentment rather than respect. Additionally, the confidentiality rule seeks to protect not only the reputation of the affected lawyer, but also the disciplinary process itself. *Rule* 1:20–9 imposes a period of enforced silence upon the filing of the grievance during which time the grievant cannot discuss the fact that he or she has filed a grievance or, more important, criticize the District Ethics Committees for unreasonably delaying the investigation of the allegedly errant lawyer. Restraining criticism of the District Ethics Committees cannot survive First Amendment scrutiny. Indeed, we

delegate to the District Ethics Committees the responsibility to police members of the legal profession, and both this Court and those committees are part of the government that the public has a right to discuss and debate. The judiciary is no more immune from the reach of the First Amendment than the executive or legislative branches.

Furthermore, although diversion is a valued component of the attorney ethics process, forbidding a grievant from discussing a grievance simply because the process resulted in diversion risks suppressing criticism of our disciplinary system. Fostering an environment where individuals are free to criticize government is precisely what the First Amendment is designed to do. Therefore, if the District Ethics Committee recommends that the matter be diverted, the fact that the respondent attorney admitted to minor misconduct and accepted diversion may be made public, but the contents of that agreement shall be kept confidential by disciplinary officials. This arrangement furthers the State's legitimate interest in encouraging diversion while accommodating grievants' First Amendment right to discuss their own grievances and the proceedings that follow.

Protecting the integrity of pending investigations is a worthy goal, but, for the above reasons, it is not a compelling interest that justifies a prohibition on speech that would otherwise be free. Investigations can be adequately protected by less restrictive means than curtailing free expression. As the Conference of Chief Justices observed: " 'Gag rules' prohibiting complainants from publicly discussing the complaint have been found unconstitutional and should never be imposed." *A National Action Plan on Lawyer Conduct and Professionalism: A Report of the Working Group on Lawyer Conduct and Professionalism* 19, § II.D.1 (Jan. 21, 1999), *available at* http://ccj.ncsc.dni. us/natlplan/NatlActionPlan.html. Accordingly, we hold that a grievant is not barred from divulging the fact that he or she filed a grievance, the content of that grievance, and the result of the process.

██ Although our holding invalidates the confidentiality provisions of *Rule* 1:20–9, there are still means whereby the disciplinary system can further an attorney's interest in confidentiality without violating the First Amendment. First, the District Ethics Committee can recommend that the grievant maintain the confidentiality of the process during the investigatory stage and the grievant can agree to do so when it is in his or her interest. Further, there may be some disciplinary investigations in which the need for secrecy is paramount and the potential harm from premature disclosure is so great that the ethics investigator may have good cause to seek an order compelling the grievant to keep confidential the investigatory proceedings. Under such circumstances, the disciplinary authorities, if they can establish a compelling need for secrecy based on the specific and articulable facts of a case, can seek an appropriate order requiring confidentiality. Finally, we observe that although grievants are absolutely immune from suit for filing an ethics complaint or making statements within the context of subsequent disciplinary proceedings, they are not immune for statements made outside the context of a disciplinary matter, such as to the media or in another public forum. *See In re Hearing on Immunity for Ethics Complainants*, 96 *N.J.* 669, 674–75 & n. 3, 477 *A.*2d 339 (1984) (explaining that grievant's public defamatory statements are actionable). Accordingly, grievants who falsely smear an attorney in public do so at their peril and may face defamation actions in appropriate cases.[3]

---

[3] We note that R.M. has not asked that ethics proceedings or documents generally be made public. Rather, in this appeal, R.M.'s request is narrow: she wishes to disclose publicly that she filed a grievance against "Jane Doe" (using her real name), that "Jane Doe" admitted minor misconduct and entered a diversionary agreement, and that R.M. is dissatisfied with that result. Thus, our holding does not alter the requirement that disciplinary authorities continue to be bound by the confidentiality provisions in *Rule* 1:20–9. As provided for in *Rule* 1:20–9(a) and (i), "all written records" compiled by the investigator and the District Ethics Committee "received and made pursuant to" the investigation are not to be made public by disciplinary officials except as provided in that Rule. The disclosure of sensitive and frequently privileged information is neither required by constitutional principle nor reflective of good policy.

## V.

### *Retroactivity*

██ Because we introduce a new rule in respect of confidentiality, we must determine whether the rule applies retroactively or prospectively. *See State v. Knight,* 145 *N.J.* 233, 249, 678 *A.*2d 642 (1996). R.M. urges that the principles espoused in this opinion be given full retroactive effect. In contrast, the State, the OAE, and the PRRC advocate that any new rule should apply only prospectively. To determine whether a new rule is to be applied retroactively, we consider three factors: "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice." *Id.* at 251, 678 *A.*2d 642.

██ The confidentiality rule serves to protect the First Amendment rights of grievants while preserving the disciplinary system's ability to conduct investigations. Although retroactivity may promote free expression and does not frustrate currently pending investigations, participants have placed great reliance on the prior rule of confidentiality. Before the current rule change, grievants and witnesses participated in ethics investigations with the understanding that their identity would remain confidential unless a formal complaint was filed. Retroactively applying the new rule would reveal their identities and statements despite those assurances of confidentiality. Furthermore, attorneys accused of minor wrongdoing have accepted diversion on the condition of confidentiality.

We find that full retroactivity would impose an undue hardship on participants who justifiably relied on the old confidentiality rule. Accordingly, the preexisting confidentiality rule shall remain in effect in previously concluded matters, whether dismissed, diverted, or otherwise resolved. A purely prospective application, however, would unnecessarily inhibit speech that would otherwise be free. Thus, we hold instead that the new rule of confidentiality

shall be given "pipeline retroactivity," *id.* at 249, 678 *A.*2d 642, and shall apply in all future cases and in matters that are still pending in the disciplinary system. R.M. is entitled to the benefit of this ruling, *see Kibble v. Weeks Dredging & Constr. Co.*, 161 *N.J.* 178, 196, 735 *A.*2d 1142 (1999), and is hereby permitted to discuss her grievance against Jane Doe, the subsequent ethics proceedings, and the outcome.

## VI.

### A.

■ Ultimately, First Amendment rights, the public interest, and the concerns of grievants require that we adjust the scope of confidentiality to allow for greater public scrutiny. Although public confidence may be shaken when an attorney commits a wrongful act, that confidence is renewed when the wrong is appropriately addressed and remedied. To accomplish that goal, citizens must be able to observe the disciplinary process unfold "at the earliest responsible stage." Comment to *R.* 1:20–9 [1995 Revision], *reprinted in* Pressler, *Current N.J. Court Rules* 1996. As always, "[s]unlight is ... the best of disinfectants." Justice Louis Brandeis, *Other People's Money* 62 (Nat'l Home Library Found. ed.1933). Accordingly, we hold that a grievant may speak publicly regarding the fact that a grievance was filed, the content of that grievance, and the result of the process. The fact that a matter is diverted and that the attorney admitted to a violation of the disciplinary rules is no longer confidential, but the contents of the diversion agreement itself are not to be disclosed by disciplinary officials. Further, documents that are gathered during the ethics proceedings are not to be released publicly by disciplinary officials except as provided for in *Rule* 1:20–9(a), (i). *See supra* pp. 8–9 (listing exceptions to the confidentiality rule). These rules apply in this appeal and to all ethics matters currently pending.

We refer this matter to the PRRC to draft rule amendments that conform to this opinion. Because any proposed amendments

are subject to this Court's review and approval, the guidelines set forth herein shall serve as interim rules until the formal adoption of the amendments.

## B.

In 1995, when the confidentiality provision underwent substantial revision and the disciplinary process became open to the public in a significant way for the first time, there was some concern regarding the anticipated effect such changes would have on the practice of law in New Jersey. Mark E. Hopkins, Note, *Open Attorney Discipline: New Jersey Supreme Court's Decision to Make Attorney Disciplinary Procedures Public—What It Means to Attorneys and to the Public*, 27 *Rutgers L.J.* 757, 757–78 (1996). However, we were guided in our decision by this simple fact:

[T]he public is entitled to this information, entitled to know of charges against attorneys, entitled to know who is the subject of those charges, and, most of all, entitled to know how the system is working. It is their system, not ours, not the attorneys'; it is their system just as is the rest of the justice system.

[*Administrative Determinations Relating to the 1993 Report of the New Jersey Ethics Commission* (1994).]

Notwithstanding the apprehension concerning those new rules, the experience since 1995 has been positive because parties, including grievants, have generally conducted themselves responsibly. We are confident, and expect, that participants in the disciplinary process will continue to act conscientiously and that the changes we introduce in this opinion will enable attorneys to retain the trust that the public has reposed in the profession.

Chief Justice PORITZ and Justices LONG, LaVECCHIA, ALBIN, WALLACE, and RIVERA–SOTO join in Justice ZAZZALI's opinion. On the issue of immunity for grievants, Chief Justice PORITZ has filed a separate Concurring opinion in which Justices LONG, ALBIN, and WALLACE join, and Justice ZAZZALI has filed a separate Concurring opinion in which Justices LaVECCHIA and RIVERA–SOTO join.

Chief Justice PORITZ, concurring.

Three members of the Court would refer the question of immunity for grievants to the PRRC for detailed reasons supporting the Committee's recommendation that absolute immunity should be eliminated if the confidentiality requirement is eliminated, even though that issue is not properly before the Court. I observe, first, that in 1995 the Court substantially limited confidentiality requirements under the rule without a corresponding limitation on absolute immunity and that adverse consequences to lawyers have not been reported. In any case, the underlying rationale for the majority opinion in *Matter of Hearing on Immunity for Ethics Complainants,* 96 *N.J.* 669, 675, 477 *A.2d* 339 (1984), was not that immunity is inextricably linked to confidentiality, but rather, that immunity fosters public trust in our disciplinary system and, most important, ameliorates concerns that "nonmalicious potential complainants" may be deterred from filing ethics complaints in fear of retaliation by the attorney. Because I believe that that rationale is as valid today as it was in 1984, I see no reason to seek guidance from the PRRC on the immunity question.

Justices LONG, ALBIN and WALLACE join in this opinion.

Justice ZAZZALI, concurring.

As the majority opinion notes, the Professional Responsibility Rules Committee proposed that if the Court limits the scope of the confidentiality requirements, then the Court should eliminate absolute immunity for grievants. That issue was neither raised by petitioner nor included in the Court's grant of certification. That said, I am inclined to agree with the PRRC recommendation, and, at the very least, would remand the matter to the PRRC to provide a detailed basis for its recommendation.

Justices LaVECCHIA and RIVERA–SOTO join in this opinion.

234

*For remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO—7.

*Opposed*—None.