IN THE MATTER OF ERNEST L. ALVINO, JUDGE OF THE SUPERIOR COURT OF NEW JERSEY.

Argued June 6, 1985—Decided July 19, 1985.

*Patrick J. Monahan, Jr.,* Acting Secretary, argued the cause for complainant Advisory Committee on Judicial Conduct.

*James J. Gruccio* argued the cause for respondent (*Gruccio, Pepper, Giovanazzi, Butler, DeSanto & Mann,* attorneys).

PER CURIAM.

In this matter the Advisory Committee on Judicial Conduct (Committee, or ACJC) has recommended a public reprimand as the appropriate discipline for the misconduct of which it has accused Judge Alvino. The charges originally brought against him, all resulting from the complaints of an attorney who had practiced before him, are that the judge was biased against that attorney, was dilatory in the performance of his judicial duties, delayed the disposition of matters unreasonably, and consistently failed accurately to complete his weekly reports. The Committee found that the evidence before it sustained two charges: that the judge's delay in disposing of some matters before him was unreasonable, and that the judge had consistently failed accurately to complete his weekly reports. Finding insufficient evidence to sustain the other charges, the Committee dismissed them. Based on the charges that it sustained, it found judicial misconduct and recommended public reprimand.

At the outset, given respondent's counsel's criticism of it, some mention should be made of the work of this Committee. It meets monthly, and, like other Supreme Court committees, its members serve without compensation. The responsibilities of the Committee are of extreme significance to the administration of justice in this state. Most of its work is never mentioned or known, for the overwhelming proportion of charges against judges have been found by the Committee, after investigation, to be unsubstantiated, indeed often frivolous. Those matters are dismissed and never made public. Much time is consumed in these matters, and on occasion a particular matter—such as the one before us—may take days of hearings both before a panel of the Committee and before the entire Committee itself. The members are people of the highest caliber, with a combination of backgrounds and experiences that are essential to assure a full understanding of the various

matters brought before them and to assure, as well, public confidence in their proceedings. We mention this, as noted above, because of the questions raised by respondent's counsel about the Committee and its work, referred to later in this opinion.[1]

Given this Committee's findings of fact (with which we have no disagreement), its conclusion that there was judicial misconduct and that a public reprimand was warranted requires our grave consideration. The Committee dealt with matters that, in the context of judicial discipline, have not yet received any judicial treatment in this state—judicial delay in disposing of litigation and judicial failure to perform administrative functions. Given the lack of prior judicial precedent on these issues, the Committee concluded that these clear violations of the Code of Judicial Conduct warranted discipline—in this case, in its opinion, a public reprimand. While we disagree, and conclude that no discipline is required under the circumstances before us, we believe that the Committee was discharging its function precisely in the manner intended by our Rules, and indeed, intended by this Court. In this case, despite the complaints of respondent's counsel, we not only find no fault with the Committee's procedures and with its substantive resolution of the matter, we commend the Committee for its work. The result we reach is different from the Committee's and this difference

---

[1]The present members of the Committee are: Honorable Mark A. Sullivan, chairman, retired Justice, New Jersey Supreme Court; Honorable Sidney M. Schreiber, vice-chairman, retired Justice, New Jersey Supreme Court; Russell N. Fairbanks, former Dean, Rutgers School of Law-Camden; Victor Harwood, III, certified trial attorney, trustee, Trial Attorneys of New Jersey, former trustee, Clients' Security Fund; George F. Kugler, Jr., former Attorney General, State of New Jersey; Lee Hilles Wertheim, senior associate, Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor, lecturer, Rutgers School of Law, editor-in-chief, Rutgers Law Review, 1974–75, former trustee, New Jersey Board of Trustees League of Women Voters, former president, Morristown Chapter, League of Women Voters; Robert L. Boyle, former publisher, Hudson Dispatch; William M. Morton, labor executive; Professor Walter F. Murphy, McCormick Professor of Jurisprudence, Princeton University, author, Guggenheim Scholar, Fullbright Scholar, NEA scholar.

is based on our interpretation of the Code of Judicial Conduct and, ultimately, of the responsibilities of a judge, an interpretation that we have not heretofore been called upon to make.

Judge Alvino has been a member of the judiciary since March 20, 1967. He is one of the senior members of our bench. His record, like that of practically all New Jersey judges, is singularly free of judicial misconduct of any kind. The record before us is uncontradicted to the effect that he works hard, and is both diligent and responsible in the discharge of his duties. The Trial Court Administrator's testimony concerning his performance portrayed him as above average in both diligence and productivity. In this respect, the evidence in the record was inconsistent with the charges made.

It was on the basis of that record that the ACJC dismissed the charge that Judge Alvino was not diligent in the performance of his duties. It did find, however, that the Judge had allowed unduly long delays in disposing of two matters. Various reasons were advanced for those delays. We need not decide whether, under all of the circumstances, an unreasonable amount of time was taken in handling and disposing of them. Indeed, we think it would be unfair to Judge Alvino to do so. A judge who has served so long and well and whose record is generally characterized by diligence cannot be said to be guilty of judicial misconduct when, out of the thousands of matters he has handled, two have been unreasonably delayed.

The Code of Judicial Conduct, adopted by this Court in 1974, requires that "[a] judge should dispose promptly of the business of the court." *Canon* 3A(5). Literally, Judge Alvino may have violated that provision. That does not mean, however, that judicial misconduct has occurred, or that discipline, whether a private or public reprimand, is appropriate. Not every failure of a judge to conform to the standards of the Code amounts to judicial misconduct or merits formal discipline. While judges are held to the very highest standards of performance in this state, they are not infallible. It was never intended

that each and every failure to conform to the standards of the Code would lead to judicial discipline. Some shortcomings were undoubtedly contemplated as inevitable, and, assuming good motives, they were not thought to provide cause for either criticism or discipline. The failure on two occasions expeditiously to dispose of matters is such a shortcoming. We are totally satisfied that atypical violations of *this kind* were not intended to, and do not, constitute judicial misconduct.[2] There is a difference between achieving high standards and perfection. The former may fall short of the latter, but it is no cause for discipline.

There are obviously other standards, goals, and requirements of the Code whose violation, no matter how atypical, and no matter how "minor," will call not only for discipline, but for the harshest discipline. Judicial misconduct, for example, involving dishonesty of any kind will ordinarily require removal as the appropriate discipline. This case is not the appropriate occasion to attempt a complete explanation of the various circumstances that will and will not constitute a violation of the Code, nor a similar explanation of what violations of the Code will and will not call for judicial discipline.[3] These issues are too important to be treated apart from the circumstances in which they may arise. It is sufficient for present purposes to

---

[2]Obviously our conclusion might be different if the violation were willful, or, regardless of intent, if it was typical of the judge's work.

[3]The standards of conduct for judges are found in various sources. The removal statute refers only to "misconduct in office, wilful neglect of duty, or other conduct evidencing unfitness for judicial office, or for incompetence." *N.J.S.A.* 2A:1B–2. Our Rules go beyond the statute, identifying the following as subject to discipline: misconduct in office, wilful failure to perform duties, incompetence, habitual intemperance, engagement in partisan politics, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute. *R.*2:15–8(a)(1)–(6). The primary source of standards, of course, is the Code itself. As noted hereafter, however, the ultimate question of whether a judge is guilty of misconduct and, if so, what the appropriate discipline, if any, should be, is ultimately one of judgment depending upon the circumstances of each case.

note that an inadvertent delay in disposing of matters before the judge, a delay that is not at all typical of his performance, warrants not judicial discipline but rather administrative correction.

The other charge against Judge Alvino sustained by the ACJC arose from the Committee's investigation of the original charges brought by complaining counsel. It is a serious charge, and, but for the circumstances mentioned hereafter, would clearly support the Committee's recommendation of a public reprimand. The charge is that the judge regularly and knowingly failed to complete his weekly reports accurately, the failure consisting of never reporting any "reserved" matters.

A "reserved" matter is a case submitted to a judge for disposition in which all that remains to dispose of the matter is the judge's decision. Ordinarily, it involves a decision that will be a final disposition of the matter. Judge Alvino acknowledges that for the eighteen years that he has been a judge, he has never listed any reserved matters at all. Obviously he has had many, as have all judges. The fact that a matter is listed does not, of itself, suggest in the slightest that the judge has failed to perform his duties, or that he has failed to conform to the very highest standards, for all that a listing under "reserved" matters means is that a particular matter has been submitted for decision and has not yet been decided; it may very well have been submitted on a Friday but not have been decided by Monday. It is only when a matter is "reserved" for an unduly long time that one must be concerned about its disposition. See generally Rule 1:32–1(a) for the weekly report requirement.

Some history is necessary in order to appreciate the importance of these weekly reports. The judicial reform effected by the 1947 Constitution was directed at many perceived shortcomings of the judicial system. If there was one unifying goal, it was the establishment of total administrative responsibility over the entire system concentrated at one point and in one

office. The multiple courts, overlapping jurisdictions, delays, and other deficiencies required correction. The remedy, instead of a host of regulations aimed at particular problems, consisted of one bold stroke—a unified court system with centralized control and administration. Subject to the general control and direction of the Supreme Court, the Chief Justice was given that responsibility and with it the power to administer the entire system.

One of the first innovations in the new court system was Chief Justice Vanderbilt's requirement that weekly reports be filed by each trial judge. This basic tool of management was important both symbolically and in fact. Symbolically it signified that there was another dimension to judging, a dimension of administrative responsibility imposed on every judge: he or she was not only to judge well but to work well, and to do whatever was necessary to assure that the entire system was functioning properly. Factually, the reports gave the Chief Justice one of many items of information needed to evaluate the system's performance and the judges' performance, all for the purpose of determining not only how well or poorly the system was performing, but precisely where help was needed. The requirement of weekly reports was obviously no revolution in general principles of management, for it was based on the proposition that the basic requirement of management is accurate information about the organization. The only "revolution" was the application of that simple principle of management to the judiciary.

There were even then, of course, other methods of obtaining information on which the Chief Justice relied, and more and more there are today newer systems, mostly dependent on computerization, used for management purposes. But through it all, without exception, the weekly report has survived. It remains an important, indeed an essential, tool for the management of the judiciary by the Supreme Court through the Chief Justice and the Administrative Director. It can also be an

invaluable tool for Assignment Judges attempting to keep current on the activities of the judges within their vicinage.

Admittedly, over the years some judges have expressed resentment at being required to complete these reports. Most judges, however, conscientiously see to it that they are regularly and accurately completed, reviewed, and signed by the judge, wisely understanding that the effective operation of the judicial system requires that kind of cooperation and effort from everyone. That cooperation from the overwhelming proportion of judges has been essential to achieving and maintaining the excellence of our judiciary.

Based on the record before us and our own experience, we conclude that Judge Alvino's conduct with respect to these reports seems to be unique. He evidences no rebelliousness or disrespect for the system. The reports were apparently accurate, and regularly filed, except for the matter of reserved decisions.[4] He simply never completed them. It is agreed on all sides that he did not seek to deceive anyone. Indeed, the Assignment Judge and Judge Alvino apparently often conferred about matters reserved by the Judge and, on occasion, Judge Alvino actually submitted some of these reserved matters to the Committee on Opinions for publication—thereby further attracting possible attention to these matters, some of which were probably delayed in resolution.

It is quite clear that Judge Alvino knew that this information was supposed to be part of the report and that his reports were inaccurate in that respect. It is also clear that for eighteen years he continued to complete weekly reports without filling in "reserved" matters, and the consistency of that failure was never noticed or called to his attention.

---

[4] In fact, the forms were completed by the Judge's secretary and thereafter reviewed and signed by him. This procedure is practical and acceptable, and is apparently the prevalent practice today.

There is probably no more important part of the weekly reports than the "reserved" matters. It tells those who are responsible for the operation of the judiciary what is *not* getting done, and tells it in a very direct, simple way. For example, if a particular case was submitted for decision two months ago, and still appears on the "reserved" matters list, the question must be asked, "why has it not been decided by now?" And any system that fails to ask that question seriously risks failure of the worst kind. Self-policing by anxiously waiting attorneys and litigants does occur (they complain), but it cannot be relied on to produce an efficient operation. The only sure method of achieving confidence in the currency of decision-making is a system that requires the judges to report those "reserved" matters. The information is so important that it is regularly reviewed at the monthly meetings of the Chief Justice and Assignment Judges.

Without doubt, a judge who willfully refuses to discharge his administrative responsibilities is guilty of misconduct. *Canon* 3B(1); *R.* 1:32–1(a). There can be no question of the importance of a judge's administrative obligations, especially in New Jersey, which has been in the forefront in the administration of justice. For an Assignment Judge, those obligations are many, indeed they have become almost overwhelming, but even for a trial judge, though the obligations are fewer, they are still most important.

▉ The clear conclusion is that if Judge Alvino willfully refused accurately to complete these weekly reports, he would clearly be subject to judicial discipline including, at the very least, public reprimand. Here, however, we do not at all have that problem for there was no willfulness in any evil sense at all. As a matter of fact, as we view it, it is clear that it would be unjust to discipline Judge Alvino in any way whatsoever for this conduct.

In the final analysis, although there are specific Rules involved, and detailed history and commentary explaining those

Rules, the imposition of judicial discipline—similar to the imposition of attorney discipline—ultimately depends on a careful analysis and evaluation of the particular facts before the Court. The Code of Judicial Conduct is not intended to condemn a judge for a single violation; nor is it the sole source of all precepts concerning judicial conduct. In most cases it is a general statement of standards and goals, admirably serving the purpose of providing guidance to judges in all matters precisely because of the generality of its provisions. In addition to the Code, however, this Court, in imposing judicial discipline, must rely on its own sense of justice, as well as on its knowledge of the history and traditions of the judiciary in this state. As Chief Justice Weintraub noted in *In re Mattera,* 34 *N.J.* 259, 270 (1961):

> It would indeed be intolerable to discipline because of mere error in judicial or professional activities. The disciplinary power is ordinarily exerted only when conduct is marked with moral turpitude and thus reveals a shortage in integrity and character.

For eighteen years this judge did the work that we expected of him. For eighteen years he completed and filed the weekly report without listing reserved decisions. It was inevitable that he would conclude, as he obviously did, that if no one ever complained after eighteen years about his failure to fill in this part of the weekly report, he was presumably doing nothing wrong. His failure to complete this portion of the report was not intended as a test of the system. He simply did not fill it in, never thought it was important, and no one, for eighteen years, ever told him anything to the contrary. As a matter of simple justice, one who apparently believes his conduct is acceptable, who is never warned that it is not acceptable, should not be disciplined for that conduct when it is not clearly harmful in and of itself. While listing of "reserved" matters is most important, it is understandable that a trial judge with this history might not fully appreciate that fact. The long and short of the matter is that it is not fair to allow someone to disregard the rules for eighteen years and suddenly condemn

him. *See In re Hinds*, 90 *N.J.* 604, 630–31 (1982); *In re Rachmiel*, 90 *N.J.* 646, 660 (1982).

So that there be no misunderstanding, we are not referring here to misconduct so egregious as to allow no consideration of the facts and circumstances that preceded or that followed— such as bribery, extortion, abuse of litigants and witnesses, involvement in serious conflicts of interest, etc. We refer here only to a failure to conform to positive standards under circumstances in which the judge has never had reason to understand how important failure to conform really is.

Having determined that Judge Alvino should not be subject to any discipline whatsoever, our opinion could conclude at this point. We find it desirable, however, to address another matter that was raised during the course of these proceedings. Counsel for respondent, in his briefs as well as in letters directed to the Chief Justice, has objected to various aspects of the Court's Rules concerning the ACJC. Based on earlier similar complaints, the Chief Justice has been seeking recommendations for specific revisions of those Rules. As to one aspect of that general complaint, however, we believe a response is appropriate at this time.

Rule 2:15–20 generally requires complete confidentiality in connection with investigations and hearings through the time when the ACJC takes appropriate action. Confidentiality in this connection includes an obligation on all parties not to make any of the information public, the obvious reason being the unfairness to a judge in publishing accusations that may affect his entire career before he has had a chance fairly to meet them. That portion of the Rule concerning confidentiality, Rule 2:15–20, reads as follows:

> The record before the Committee shall be confidential and shall not be available to any person except in the proper discharge of his official duties, provided however that the Committee and its designated staff personnel shall have access to it in the performance of their duties, and provided further that, if a Judge who is the subject of a complaint requests it, the charge, the proceeding of the Committee thereon, and the action of the Committee with respect to the charge, shall be made public.

> Upon the issuance of a complaint for removal or an order to show cause, the presentment of the Committee, together with any briefs filed pursuant to an order of the Court, shall be made public. The entire record in such a matter shall, unless the Court otherwise directs, be made public upon the entry of a final order imposing discipline.

The "order to show cause" referred to, the issuance of which automatically makes public the Committee's presentment (as well as any briefs filed pursuant to an order of the Court), ordinarily follows the issuance of a presentment by the Committee (confidential at that point) and its delivery to the Court. While a respondent has the opportunity to "move in writing" for a dismissal of the presentment, *R.* 2:15-13, and to do so before the issuance of any order to show cause, such relief is rarely granted since assurance concerning the proper disposition of the matter ordinarily requires hearing a full presentation by all concerned. The result is that, almost invariably, upon the filing of a presentment with the Court, the Court will issue its order to show cause, thereby triggering the provision that makes public the presentment and any briefs filed with the Court.

The problem arises when the ACJC has recommended public discipline, respondent taking the position that no discipline is appropriate, or, at the most, private discipline. The main advantage of private discipline, obviously, is that its issuance is not known by the public and the judge's reputation is therefore not affected. That difference between public and private discipline, an extremely important one, and an especially important difference from the point of view of the judge, is thought to become practically obliterated when, by virtue of the issuance of an order to show cause, the presentment is made public before the judge has a full opportunity to argue before the Court that no discipline or, at most, private discipline, is appropriate. From counsel's point of view, the judge has lost the case before the argument, for the substantial relief that he sought was to prevent the matter from becoming public, thereby unfairly reflecting on his integrity, competence, or whatever other quality may be involved.

Indeed, it may appear incongruous to allow public argument on the question of whether discipline should be public or private—the public nature of the argument deciding, in effect, by itself that the discipline *is* public. Assuming, upon full consideration, the Court decides that the appropriate discipline should have been private, the unfairness to the judge is obvious and irreparable. No matter how generous this Court's opinion exonerating the judge from the charge, no matter what praise of the judge might be expressed by the Court, there will undoubtedly be some residue of doubt in the public's mind, and especially in that portion of the public that may have read only the newspaper rendition of the presentment but somehow failed to read the later publication of the Court's opinion. In this case that potential unfairness is compounded by the Court's conclusion here that *no* discipline should have been imposed; and the unfairness is in some sense made even worse by the fact that Judge Alvino has served almost as long as any other judge in the system.

Based on all of this, respondent's counsel, as well as others, have suggested that before any presentment by the Committee recommending public discipline is made public, counsel should have the opportunity to address fully all of the issues, in order to persuade the Court that either no discipline or private discipline at the most is appropriate, that opportunity including, presumably, oral argument *in camera.*

The problem is difficult, and the Court has been concerned with it for some time. Indeed, in the last three cases of presentments recommending public discipline of judges, the same problem was faced. In one of those cases the Court decided that private discipline was sufficient and found itself in the position of being obliged to make that fact public since the oral argument on whether public discipline should be imposed was public. *See also In re Sadofski,* 98 *N.J.* 434 (1985). Quite clearly, if all that was involved was the interest of the judge, basic fairness would give him or her the opportunity to persuade this Court that discipline should be private and to do so

without any public revelation whatsoever of the matter until the Court decided the issue.

There are, however, other interests involved, important interests that go beyond consideration of the justice or the injustice done to a particular respondent, as important as that undoubtedly is. In New Jersey, except for impeachment, the system of judicial discipline is controlled completely by this Court. *N.J. Const.* of 1947 art. VI, § 6, para. 4. While the *causes* for *removal* are subject to legislative control, the ultimate power is that of the Court. That power imposes great responsibilities on the Court, not the least of which is assuring the public that our exclusive power to discipline judges is being wisely exercised. When judges alone are vested with the power to discipline other judges, the potential for public cynicism and distrust is obvious. The best insurance of the integrity of the system and therefore the greatest assurance of public confidence is the status, the prestige, and the composition of the ACJC. With rare exceptions, it handles all complaints against judges and makes the initial determination of whether discipline by this Court is warranted. Those appointed have traditionally been of such quality as to remove all doubt concerning their absolute independence and integrity. In addition, the Rule constituting the Committee provides that it shall consist of two *retired* justices or judges, not fewer than three attorneys, and not more than four public members who do not hold public office of any nature. There are no sitting judges on this Committee.

Given its composition, the Committee can rightfully command full public confidence in its proceedings and, indeed, it presently enjoys such confidence. That confidence will not last very long, however, if all of the proceedings of this Committee are to be kept secret. They are, as noted above, precisely that when the Committee decides there is no reason for discipline, in which case that secrecy represents a balance, in favor of the judge, of the public's right to know and the judge's right not to be treated unfairly. That seems to be a sensible balance, especially in view of the fact that there are no active judges on the

Committee and that three of its members are public members. But what claim to the public's confidence can be made if proceedings are also kept secret when the *Committee* itself has concluded they should be made public—its conclusion reflected in its recommendation of public discipline? While the Rules contemplate recommendations in a presentment ranging from "censure, suspension or removal," *R.* 2:15–12, the historical fact is that the Committee has never recommended in its presentments anything other than either public discipline or removal, and overwhelmingly, where there is a presentment, public discipline rather than removal.

If, therefore, we were to resolve the matter in favor of the interest in assuring fairness to the judge any time counsel for a respondent objected to public discipline and requested oral argument *in camera* on that question before the matter was made public, we would find that in this court-controlled system, in the few matters in which the public has *any* chance of observing it—and thereby strengthening the public's confidence in it—there would be a further cloak of secrecy. If the public learned about the matter only when the Court sustained a recommendation of public discipline, the public understandably might wonder what assurance of legitimacy really arises from the composition of this Committee when this judge-controlled system for disciplining judges elects not to disclose a recommendation by this prestigious Committee for public discipline.

 If this system is to remain intact, it is absolutely essential that the public have confidence in its operation and have good reason for that confidence. In our opinion the most likely way of achieving that is by assuring the public that whenever this independent Committee recommends that a judge be publicly disciplined, the public will know of that fact whether the

Court thereafter agrees or disagrees, and will know it as soon as that presentment is filed with the Court.[5]

*For dismissal*—Chief Justice WILENTZ and Justices CLIF-FORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

---

[5]Our research indicates that in the overwhelming proportion of states, proceedings against a judge are made public at the same time as or earlier than is the case in New Jersey. The California Supreme Court recently considered the same problem addressed in the latter part of this opinion and concluded that while the possibility of unfairness to the judge was obvious, public confidence required that the matter be made public upon the issuance of the presentment. The court did conclude, however, that it would be advisable to modify the system so as to allow the expiration of thirty days before making the presentment public, in order to give the respondent a chance to file a brief in response to the presentment, all for the purpose of assuring that when the matter is released to the press, there be more than a one-sided presentation of the matter, the press receiving both the presentment and respondent's answer at the same time. This modification appears sensible, and the Court intends to consider its implementation in New Jersey.