884 A.2d 808 (2005)
381 N.J. Super. 41
STATE of New Jersey, Plaintiff-Appellant,
v.
Joseph CLARK, Emma Jackson and David Bowman, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 12, 2005.
Decided October 12, 2005.
Filed October 21, 2005.
Robert Czepiel, Jr., Deputy Attorney General, argued the cause for appellant (Peter C. Harvey, Attorney General, attorney; Mr. Czepiel, of counsel and on the brief).
R. Brian McLaughlin, Teaneck, argued the cause for respondent Advisory Committee on Judicial Conduct and John A. Tonelli (Elaine D. Dietrich, Trenton, counsel to the Administrative Director, Administrative Office of the Courts, attorney; Ms. Dietrich, of counsel and on the brief; Mr. McLaughlin, on the brief).
Respondents Joseph Clark, Emma Jackson and David Bowman did not participate in this appeal.
*809 Before Judges WEFING, FUENTES and GRAVES.
The opinion of the court was delivered by
WEFING, P.J.A.D.
On October 12, 2005, we entered an emergent order granting the State's motion for leave to appeal and reversing the trial court's order quashing a certain subpoena. We noted within that order that an opinion would follow in due course. This opinion sets forth the basis for our disposition.
Defendant Clark is the former municipal court judge in Englewood, while defendant Bowman is the Chief of the Englewood Police Department, and defendant Jackson is a sergeant in that department. In September 2004, a State Grand Jury indicted these defendants for tampering with public records or information, N.J.S.A. 2C:28-7a(2), a crime of the third degree, and falsifying or tampering with records, N.J.S.A. 2C:21-4a, a crime of the fourth degree. The indictment alleges that the three defendants acted improperly in March 2003 to arrange the issuance of a fictitious warrant for the arrest of Lloyd Fields, then an inmate at the Bergen County Jail, to permit his attendance at funeral services for his father, in derogation of the governing statute and regulations. N.J.S.A. 30:4-8.1, -8.2; N.J.A.C. 10A:18-7.1 to -7.9.
The alleged actions of these defendants triggered both a criminal investigation and, in light of defendant Clark's status, an investigation by the Advisory Committee on Judicial Conduct ("ACJC"). According to the record before us, the ACJC suspended its investigation once the grand jury returned its indictment. We are informed that upon return of that indictment, defendant Clark retired from his position as municipal court judge and defendants Bowman and Jackson were suspended from their positions with the Englewood Police Department. Defendant Clark's retirement did not divest the ACJC of its authority to investigate this incident. R. 2:15-23.
Defendants' trial was scheduled to commence during the last week of September 2005. On September 6, 2005, the State of New Jersey served an "on call" subpoena upon John A. Tonnelli, Chief Investigator of the ACJC, to testify concerning statements defendants were alleged to have provided to the ACJC during the course of its investigation. The ACJC moved to quash this subpoena, contending the materials were confidential under R. 2:15-20. Defendants did not join in the motion to quash. Their unanimous position before the trial court was simply that the matter should be resolved prior to opening statements and that if the motion were denied and the statements produced, a brief adjournment might be required to permit counsel to review the statements and become familiar with them. After hearing argument, the trial court granted the ACJC's motion and issued an order quashing the subpoena. The State's emergent application followed.
The ACJC is a committee appointed by the Supreme Court, consisting of nine members; at least two members must be retired Judges or Justices of the Superior or Supreme Court, three must be members of the bar and no more than four shall be members of the public who may not hold a public office of any sort. R. 2:15-2. The ACJC is charged with the responsibility of investigating allegations that a judge, whether of the Superior, Surrogate's, Tax or Municipal Court is guilty of improper conduct. R. 2:15-8. As our Supreme Court has recognized, it is "absolutely essential that the public have confidence" in the integrity of our system of *810 judicial discipline. In re Alvino, 100 N.J. 92, 107, 494 A.2d 1014 (1985).
[T]he greatest assurance of public confidence is the status, the prestige, and the composition of the ACJC .... Those appointed [to the ACJC] have traditionally been of such quality as to remove all doubt concerning their absolute independence and integrity.
[Id. at 106, 494 A.2d 1014.]
To fulfill its investigative responsibilities, the ACJC may take statements under oath, inspect books and records, issue subpoenas and take depositions. R. 2:15-6(a).
R. 2:15 deals in two places with the confidentiality of ACJC proceedings. R. 2:15-4(c) provides that "[a]ll papers filed with and proceedings before the Committee shall be confidential except as otherwise provided in these Rules." R. 2:15-20 states:
(a) Except as provided in paragraphs (b) and (c) below and in Rule 2:15-25 (Referral for Administrative Action), the record before the Committee shall be confidential and shall not be available to any person except in the proper discharge of official duties. In all circumstances, prehearing conferences, deliberations of the Committee, and information subject to a protective order shall remain confidential.
(b) If the Committee files a formal complaint against the judge, the complaint and all further proceedings thereon shall be public except that the Committee may apply to the Supreme Court for permission to retain confidentiality in a matter involving special circumstances, such as when the Committee determines that the privacy interests of a witness or other person connected with the matter outweigh the public interest in the matter.
(c) If a judge who is the subject of a grievance requests it, the charge, the proceeding of the Committee thereon, and the action of the Committee with respect to the charge shall be made public.
Before both the trial court and this court, the ACJC stressed that the rule contains no provision authorizing it to respond to a subpoena by releasing statements it may have obtained in the course of investigating an allegation of judicial misconduct. We are satisfied, however, that the fact that the rule is silent on the question does not indicate that the Court intended, in the circumstances presented to us, that such statements should not be made available for review and possible use during criminal proceedings involving the same subject matter as those statements.
In Alvino, the Court discussed at length the question of confidentiality of ACJC proceedings. It noted:
Rule 2:15-20 generally requires complete confidentiality in connection with investigations and hearings through the time when the ACJC takes appropriate action. Confidentiality in this connection includes an obligation on all parties not to make any of the information public, the obvious reason being the unfairness to a judge in publishing accusations that may affect his entire career before he has had a chance fairly to meet them.
[Alvino, supra, 100 N.J. at 103, 494 A.2d 1014.]
Here, however, the "obvious reason" for confidentiality, avoiding unfairness to the judge, has no bearing because the allegations against defendant Clark became public knowledge upon return of the grand jury's indictment against him. He will defend himself against these allegations in proceedings held in a public courtroom, open to anyone to attend and observe. We decline to apply a rule the reason for which has disappeared. Immer *811 v. Risko, 56 N.J. 482, 487, 267 A.2d 481 (1970); Long v. Landy, 35 N.J. 44, 51, 171 A.2d 1 (1961).
In argument before this court, the State took the position that its obligation to investigate allegations of criminal activity trumped the confidentiality provisions of R. 2:15-20, to the extent that it would be entitled, even during the early stages of a criminal investigation, to review materials gathered by the ACJC. We are not called upon to address that question, however. The State served its subpoena in this matter, not during the preliminary stages of its investigation, but only after an indictment had been returned.
The ACJC also contends that its functions might be hampered if it were to become entangled in such proceedings as the instant one. That concern is indeed a valid one. We are satisfied, however, that it is equally inapplicable to the instant situation. Once the ACJC became aware that a criminal investigation into the events of March 2003 had commenced, it suspended all proceedings of its own with regard to those events. Counsel to the ACJC informed the trial court during oral argument that such a suspension is the standard procedure of the ACJC in the event an individual it is investigating is also the subject of pending criminal proceedings. Because the ACJC is not currently engaged in ongoing investigational activities with regard to defendant Clark, it would not hinder the Committee's activities with regard to him to respond to this subpoena.
We note for the sake of completeness with regard to this contention that the activities of the ACJC might be impeded if it had to comply with this subpoena, that there was no assertion before us that other pending investigations might be interrupted if Chief Investigator Tonelli responded to the subpoena served upon him. Even if such an assertion were to be made, it is our judgment that relief, if appropriate, should be less drastic than a wholesale quashing of the subpoena.
An additional factor informing our analysis is that no defendant has objected to the release of his or her statement to the ACJC. The ACJC contends that it has acted, not to preserve the confidentiality rights of any of these defendants, but to support the procedure set forth in the governing rules. We have already noted, however, our view that R. 2:15-20 should be analyzed in view of its underlying purposes and not solely with regard to literalisms. New Jersey Democratic Party, Inc. v. Samson, 175 N.J. 178, 194, 814 A.2d 1028 (2002) (noting that courts "must consider the fundamental purpose" of an enactment and "interpret it in a manner consonant with the probable intent of the draftsman had he anticipated the matter at hand"); Morss v. Forbes, 24 N.J. 341, 357, 132 A.2d 1 (1957) (noting "On many occasions the sense or spirit of a statute will prevail over the literal, logical, grammatical meaning of the words, if the latter is not in accordance with reason or the principal design of the statute").
We note, moreover, the posture of the case at which the issue before us arose, i.e., the question presented is one of pre-trial discovery and preparation, not admissibility at trial. Because the statements have not been produced, and the contents are known only to the ACJC, it is impossible to predict whether those statements, or any portion of them, may properly be used at defendants' trial. That is a determination that the trial court must make when and if the question is presented at trial.
The overarching factor which guides our disposition is our view that in the context presented, the necessity to ensure the integrity and accuracy of the *812 pending criminal proceedings must take precedence over the confidentiality provisions of R. 2:15-20. A trial is, at bottom, a search for truth. "Throughout their judicial endeavors courts seek truth and justice and their search is aided significantly by the fundamental principle of full disclosure." In re Richardson, 31 N.J. 391, 401, 157 A.2d 695 (1960) (holding that identity of person who paid attorney his fee is not protected by the attorney-client privilege). "[T]he fundamental theory of our judicial system [is] that the fullest disclosure of the facts will best lead to the truth and ultimately to the triumph of justice." In re Selser, 15 N.J. 393, 405, 105 A.2d 395 (1954) (holding communications from deceased client about that client's commission of continuing or prospective crime not shielded by attorney-client privilege). Because "[t]he jury in the trial of a criminal case is responsible ... for finding the truth ... it is therefore important that the evidence be as full and complete as possible in order to aid the search for truth and assure the just and correct result." State v. Ingenito, 87 N.J. 204, 211, 432 A.2d 912 (1981) (holding that the State's use of collateral estoppel to establish an element of the crime charged violated defendant's right to trial by jury). Thus, the Supreme Court has said, "no court rule was, is or ever shall be, designed to provide confidentiality to acts discovered through disciplinary investigations when those acts amount to potential criminal conduct." State v. Stroger, 97 N.J. 391, 410, 478 A.2d 1175 (1984) (quoting State v. Stroger, 185 N.J.Super. 124, 132, 447 A.2d 598 (1981)).
The objective of every trial is a search for the ultimate truth. State v. Szemple, 135 N.J. 406, 413, 640 A.2d 817 (1994). "More than in any other context, the criminal trial setting requires our most diligent effort to ensure that the truth emerges and that the right result is reached." In re Hinds, 90 N.J. 604, 617, 449 A.2d 483 (1982) (upholding the validity of disciplinary proceedings against an attorney for making out-of-court statements criticizing a trial judge's conduct of an ongoing criminal trial).
In our judgment, to uphold the ACJC's claim of confidentiality in the context of this post-indictment subpoena would run counter to the commitment of our judicial system to the presentation of evidence that is "as full and complete as possible." Ingenito, supra, 87 N.J. at 211, 432 A.2d 912.
For more than three centuries it has [now] been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule. (Cases cited and quoted).... When the course of justice requires the investigation of the truth, no man has any knowledge that is rightly private. All that society can fairly be expected to concede is that it will not exact this knowledge when necessity does not demand it, or when the benefit gained by exacting it would in general be less valuable than the disadvantage caused; ... From the point of view of society's right to our testimony, it is to be remembered that the demand comes, not from any one person or set of persons, but from the community as a whole,  from justice as an institution, and from law and order as indispensable elements of civilized life.
[In re Tiene, 19 N.J. 149, 164, 115 A.2d 543 (1955) (quoting 8 Wigmore on Evidence §§ 2192 and 2193 (3d ed.1940)).]
*813 It is also our judgment that to uphold the ACJC's claim of confidentiality in this matter would run counter to the Supreme Court's expression in Alvino that public disclosure of the ACJC's recommendation of public discipline of a judge is required to maintain public confidence in the disciplinary system. The Court reached that conclusion even in the face of its recognition that such disclosure may work an unfairness to a judge who ultimately convinces the Court that discipline is not warranted. The necessity of assuring that public confidence, the Court concluded, outweighed any such potential unfairness. The Court stated:
If ... we were to resolve the matter in favor of the interest in assuring fairness to the judge any time counsel for a respondent objected to public discipline and requested oral argument in camera on that question before the matter was made public, we would find that in this court-controlled system, in the few matters in which the public has any chance of observing it  and thereby strengthening the public's confidence in it  there would be a further cloak of secrecy. If the public learned about the matter only when the Court sustained a recommendation of public discipline, the public understandably might wonder what assurance of legitimacy really arises from the composition of the Committee when this judge-controlled system for disciplining judges elects not to disclose a recommendation by this prestigious Committee for public discipline.
[Alvino, supra, 100 N.J. at 107, 494 A.2d 1014.]
We fully recognize that the ACJC has reached no determination as yet whether to make a recommendation for disciplinary proceedings against defendant Clark. We are firmly convinced, however, that actions by the ACJC to withhold from the State any statements from these three defendants the ACJC may have gathered during the course of its investigation will not serve to strengthen public confidence in whatever verdict a jury may return.
Although not mentioned by the parties, we stress that we see no conflict between our decision in this matter and the Supreme Court's recent decision in State v. Williams, 184 N.J. 432, 877 A.2d 1258 (2005), in which the Court upheld the confidentiality of statements made during the course of mediation. The Court engaged in a careful analysis of the competing interests involved and concluded that there was a substantial interest in protecting mediation confidentiality. Id. at 446-50, 877 A.2d 1258. There has been no showing to us, however, that any interest would be furthered by precluding the State from having any access to these statements.
Finally, we note the State suggested as an alternative form of relief that the statements be produced to the trial court for its in camera inspection and determination during trial whether, if a defendant testified at trial, that testimony was so at variance with his or her earlier statement that it should be delivered to the prosecution for use in cross-examination. The ACJC rejected this suggestion as no less an intrusion upon the confidentiality of its proceedings.
We have, upon reflection, determined to reject this proffered alternative. We do so for two reasons. Parties may submit documents to a trial court for in camera inspection when there is an assertion that the document itself contains privileged material. In that instance, the trial court will review the document to determine whether the party's assertions are correct and, in certain instances, to determine whether the document can be redacted so as to permit production and inspection. Loigman v. Kimmelman, 102 N.J. 98, 112-14, *814 505 A.2d 958 (1986); Hartz Mountain Indus., Inc. v. New Jersey Sports & Exposition Auth., 369 N.J.Super. 175, 182-85, 848 A.2d 793, certif. denied, 182 N.J. 147, 862 A.2d 56 (2004). In this instance, however, the ACJC does not assert that the documents contain privileged or confidential material. Rather, it asserts that the nature of the document itself is confidential. In such a context, we perceive no substantial value to ordering the ACJC to produce the document for the trial court's inspection.
Further, we are of the view that it would place too heavy a burden upon the trial court to make it responsible for assessing the credibility of a witness's testimony in light of a prior statement by that witness and weighing the value of that statement to the prosecution if it were to be used in cross-examination. A trial court's responsibilities are heavy enough without our adding to them unnecessarily.
After entry of our order in this matter, the Supreme Court issued its opinion in R.M. v. Supreme Court of New Jersey, 185 N.J. 208, 883 A.2d 369 (2005), in which it struck down as unconstitutional R. 1:20-9, which mandated that an ethics grievance remain confidential until a formal complaint is filed. The plaintiff, R.M., had filed a grievance against an attorney. The Court agreed with R.M.'s assertion that the rule impermissibly restrained her free speech. R.M., supra at 211, 883 A.2d 369.
We have reviewed the Court's opinion in R.M. and are satisfied that it does not call for us to alter or modify our determination in this matter in any way. Indeed, within its opinion, the Court quoted approvingly from a United States Supreme Court opinion, Landmark Commc'ns v. Virginia, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), in which that Court struck down a Virginia law imposing criminal sanctions on anyone disclosing information about judicial ethics proceedings.
[t]he assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion.... [A]n enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.
[R.M., supra at 218, 883 A.2d 369.]
That language echoes the principles enunciated by our own Supreme Court in Alvino, supra, 100 N.J. at 107, 494 A.2d 1014, which we set forth earlier in this opinion.
We recognize that within the body of its opinion in R.M., the Court noted the requirement that disciplinary authorities, as opposed to grievants, maintain the confidentiality of an investigation was unaffected by its disposition. R.M., supra at 229, 883 A.2d 369. We do not, however, for all the reasons we have set forth earlier in the body of our opinion, consider that passing statement authority to uphold the ACJC's position in this matter.
For the reasons stated, the trial court's order quashing this subpoena is reversed, and the matter remanded for further proceedings.