924 A.2d 542

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JOSEPH M. CLARK, DAVID BOWMAN AND
EMMA JACKSON, DEFENDANTS.

_____

(ADVISORY COMMITTEE ON JUDICIAL CONDUCT
AND JOHN A. TONELLI–APPELLANTS).

_____

Argued January 16, 2007—Decided June 21, 2007.

504

*John C. Connell*, argued the cause for appellants (*Archer & Greiner*, Special Counsel to the Advisory Committee on Judicial Conduct, attorneys; *Elaine D. Dietrich*, Counsel to the Administrative Director, of counsel; *Mr. Connell, Ms. Dietrich* and *R. Brian McLaughlin*, on the briefs).

*Robert H. Czepiel, Jr.*, Deputy Attorney General, argued the cause for respondent (*Stuart Rabner*, Attorney General of New Jersey, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

In September 2004, a State Grand Jury issued an indictment charging the municipal court judge for the City of Englewood, Joseph Clark, and two co-defendants, with third-degree tampering with public records in violation of *N.J.S.A.* 2C:28–7(a)(2), and fourth-degree falsifying or tampering with records in violation of *N.J.S.A.* 2C:21–4(a). Judge Clark also had been under investigation by the Advisory Committee on Judicial Conduct (ACJC), for ethical violations related to the conduct that led to the indictment. Prior to the start of the criminal trial, the State served a *subpoena ad testificandum* on the ACJC's investigator who had interviewed Clark and his co-defendants in the judicial ethics investigation. The question presented to us is whether the confidentiality requirements that usually apply to ACJC investigations preclude the investigator from complying with the subpoena.

In these unique circumstances, when a judge has been indicted for crimes arising from the same conduct that triggered the ACJC's judicial disciplinary investigation and a subpoena has been served in preparation for the impending criminal trial, we hold that the ACJC and its staff must comply with the subpoena to testify.

## I.

The procedural history of this matter and the facts, including those alleged in the indictment, may be summarized as follows. In March 2003, Clark was serving as the municipal court judge in Englewood when he allegedly acted in concert with Police Chief David Bowman and Police Detective Emma Jackson to issue a fictitious warrant that enabled an inmate to attend a funeral mass, burial, and after-burial reception for his father. Allegedly, Clark had the inmate transferred from the Bergen County Jail to the custody of the Englewood police under the guise that the inmate would be appearing in Englewood municipal court. Court was not in session on the day of the supposed transfer, however. Rather, the inmate attended his father's funeral, unguarded, in violation of *N.J.S.A.* 30:4–8.1, –8.2, and *N.J.A.C.* 10A:18–7.1 to –7.9.

As a result of those circumstances coming to light, criminal and ethical investigations were commenced. As a part of the judicial ethics investigation, John A. Tonelli, chief investigator for the ACJC, interviewed Clark, Bowman, and Jackson about the municipal court warrant that issued in March 2003. Scott Donlan of the New Jersey Division of Criminal Justice also was investigating the matter. Ultimately, Donlan testified before a State Grand Jury to the facts that his investigation uncovered. As a result, Clark, Bowman, and Jackson were indicted for third-degree tampering with public records or information, contrary to *N.J.S.A.* 2C:28–7(a)(2), and fourth-degree falsifying or tampering with records, contrary to *N.J.S.A.* 2C:21–4(a). Based on issuance of the State Grand Jury's indictment, Clark was suspended from judicial office by order of this Court and the ACJC's investigation into the matter ceased, pending the outcome of the criminal proceedings. Clark subsequently retired from his judicial position.

In preparation for trial, the State served Tonelli with a *subpoena ad testificandum,* seeking his testimony about the interviews that he conducted with Clark, Bowman, and Jackson. Tonelli and the ACJC filed a motion to quash the subpoena, citing *Rule* 2:15–20's confidentiality requirements. The motion was granted by the

trial court but, on the State's motion for leave to appeal, was reversed by the Appellate Division. *State v. Clark,* 381 *N.J.Super.* 41, 47, 884 *A.*2d 808 (App.Div.2005). The panel held that "the necessity to ensure the integrity and accuracy of the pending criminal proceedings must take precedence over the confidentiality provisions of *R[ule]* 2:15–20." *Ibid.* The panel also granted a stay while the ACJC and Tonelli sought review by this Court. We granted leave to appeal and continued the stay. 187 *N.J.* 75, 899 *A.*2d 298 (2006).

## II.

Our Constitution authorizes this Court to remove judges from office "for such causes and in such manner as shall be provided by law." *N.J. Const.* art. VI, § 6, ¶ 4; *see also N.J.S.A.* 2B:2A–2 (authorizing removal of judges "for misconduct in office, willful neglect of duty, or other conduct evidencing unfitness for judicial office, or for incompetence"). We established the ACJC to assist us in the fulfillment of our solemn responsibility concerning judicial discipline. *R.* 2:15–1. The important and sensitive work of the ACJC has been recognized as being "of extreme significance to the administration of justice in this [S]tate." *In re Alvino,* 100 *N.J.* 92, 94, 494 *A.*2d 1014 (1985). And, although we certainly are aware of the high responsibility that is entrusted to the carefully selected members of the ACJC, *see R.* 2:15–2, we are also mindful that, as a result of our disciplinary processes, "[m]ost of [the ACJC's] work is never mentioned or known, for the overwhelming proportion of charges against judges have been found by the [ACJC], after investigation, to be unsubstantiated, indeed often frivolous," *Alvino, supra,* 100 *N.J.* at 94, 494 *A.*2d 1014. That brings us to this unique dispute, which involves whether that cloak of confidentiality will be lifted in the face of an indictment.

In tasking the ACJC with investigating alleged ethical misconduct by judges, we have conferred on it the power to "(1) administer oaths, (2) order the inspection of books and records, (3) take depositions of necessary witnesses, [and] (4) issue subpoenas

for the attendance of witnesses and for the production of papers...." *R.* 2:15–6(a). Furthermore, we require judges to "cooperate with and give reasonable assistance and information to the [ACJC] in connection with any investigations by or proceedings of the [ACJC]." *R.* 2:15–7. That said, the process holds out the prospect that the investigatory proceedings before the ACJC will be kept confidential, provided a complaint does not issue. *See R.* 2:15–20. The *Rules* state that "[a]ll papers filed with and proceedings before the [ACJC] shall be confidential except as otherwise provided in these Rules." *R.* 2:15–4(c). *Rule* 2:15–20 details the confidentiality limits applicable to the process.[1] *Rule* 2:15–20(a) states:

> Except as provided in paragraphs (b) and (c) below and in Rule 2:15–25 ..., the record before the [ACJC] shall be confidential and shall not be available to any person except in the proper discharge of official duties. In all circumstances, prehearing conferences, deliberations of the [ACJC], and information subject to a protective order shall remain confidential.

▮▮▮▮ The approach taken in respect of the construction of court rules is the same as that for the construction of statutes. *See Wiese v. Dedhia,* 188 *N.J.* 587, 592, 911 *A.2d* 479 (2006) ("When interpreting court rules, we ordinarily apply canons of statutory construction."); *First Resolution Inv. Corp. v. Seker,* 171 *N.J.* 502, 511, 795 *A.2d* 868 (2002) (stating that "[t]he same principles of statutory construction apply to rule construction" (quoting *State v. Vigilante,* 194 *N.J.Super.* 560, 563, 477 *A.2d* 429 (L.Div.1983))). Thus, we typically begin by examining the plain language of a court rule, and give the words their ordinary meaning. *Wiese, supra,* 188 *N.J.* at 592, 911 *A.2d* 479 (citing *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.2d* 1039 (2005)). We turn to extrinsic materials when the language of the rule is

---

[1] *Rule* 2:15–20 contains two exceptions from its confidentiality requirement. Once the ACJC files a formal complaint against a judge, the complaint and the proceedings become public. *R.* 2:15–20(b). Also, the judge subject to the investigation and grievance may request that the charges be made public. *R.* 2:15–10(c). Neither exception is implicated in this case.

ambiguous and lends itself to more than one plausible interpretation. *Ibid.*

The ACJC and its staff argue that the language is clear and that, regardless, the import of *Rule* 2:15–20 is that confidentiality of the investigatory record is the norm. Moreover, they note pointedly that the *Rule* contains no express exception for the release of investigatory information prior to issuance of a formal complaint, notwithstanding a subpoena to testify in a criminal trial. The State, on the other hand, urges that we find that the important interests of criminal justice override the interests of confidentiality in the judicial discipline system once an indictment has issued against a judge and a criminal trial is about to take place.

### III.

### A.

"Throughout their judicial endeavors courts seek truth and justice and their search is aided significantly by the fundamental principle of full disclosure." *In re Richardson*, 31 *N.J.* 391, 401, 157 *A.2d* 695 (1960). A *subpoena ad testificandum* is one method for prompting disclosure. *See Black's Law Dictionary* 1440 (7th ed. 1999) (defining *subpoena ad testificandum* as "[a] subpoena ordering a witness to appear and give testimony"). The *Rules* permit an attorney to issue a subpoena to compel a person "to attend and give testimony at the time and place specified therein." *R.* 1:9–1. And, every person has a public duty "to appear in court when commanded to testify," even if it affects his or her private interest. *Reiman v. Breslin*, 175 *N.J.Super.* 353, 357, 418 *A.2d* 1293 (App.Div.) (citing *United States v. Bryan*, 339 *U.S.* 323, 331, 70 *S.Ct.* 724, 730, 94 *L.Ed.* 884, 890–91 (1950)), *certif. denied*, 85 *N.J.* 147, 425 *A.2d* 298 (1980); *see also In re Application of Tiene*, 19 *N.J.* 149, 164, 115 *A.2d* 543 (1955) ("[W]e start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any

exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule." (quoting 8 *Wigmore on Evidence* § 2192 (3d. ed. 1940))). Thus, a justification for being excused from providing testimony under subpoena necessitates the identification of some clearly defined interest that is advanced by such exemption.

In this instance, although there is the general assertion of confidentiality over the investigatory stage of the disciplinary process, our *Rules* do not specifically address the circumstance of a subpoena issued in respect of a criminal trial against a judge. On the other hand, *Rule* 2:15–20 recognizes that disclosure can occur notwithstanding the confidentiality overlay. The *Rule* includes an unexplicated reference to disclosure being permitted to a person "in the proper discharge of official duties." *R.* 2:15–20. In this instance then, we must look beyond the literal language of the *Rule* to discern whether there is some clear interest to be advanced by excusing the ACJC's chief investigator from giving testimony, when subpoenaed to appear in a criminal trial, about his investigation into a matter that is now in the public domain as a result of the grand jury's action.

### B.

*Rule* 2:15–20 was last amended in 1997. Prior to that amendment, this Court had created the New Jersey Advisory Committee on ACJC Confidentiality (Committee) and charged it with determining when judicial disciplinary proceedings should be made public. New Jersey Supreme Court Advisory Committee on ACJC Confidentiality, *Report of the Committee on ACJC Confidentiality*, at 1 (Dec. 6, 1995). The Committee concluded instead that the proceedings should remain confidential and reported to the Court that confidentiality in the judicial disciplinary process served four interests: "judicial independence," "public confidence in the judiciary," "flexibility to resolve minor problems," and "fairness to individual judges." *Id.* at 12. In making its recommendation, the Committee considered and rejected the American

Bar Association's *Model Rules for Lawyer Disciplinary Enforcement*, which included language that would grant to the ACJC, or its equivalent, the discretion to release confidential information to a public official when the ACJC believed that it would help in the administration of justice. *Id.* at 7–12 (discussing *Model Rule* 11.B(1)(a)). The Committee concluded that that language would not adequately protect the four identified interests, and, thus, did not satisfactorily protect "the integrity of the judicial system." *Id.* at 12.

*Rule* 2:15–20, as amended, does not contain the discretionary language recommended by the ABA for attorney disciplinary proceedings, although, as noted, it includes the reference that confidentiality interests shall not preclude release of information to a person "in the proper discharge of official duties." In construing the *Rule's* general assertion of confidentiality, we must determine whether it is sensible to rigidly interpret that requirement so that it would justify noncompliance with a subpoena issued in a criminal trial of a publicly indicted judge. Specifically, we must examine closely whether the interests that favor maintenance of confidentiality over ACJC investigations have any bearing in the unique circumstances in which we find ourselves. *Cf. State v. Stroger*, 97 *N.J.* 391, 409, 478 *A.2d* 1175 (1984) (analyzing similar confidentiality requirement in respect of attorney ethics investigation and noting that "we must not lose sight of the rationale behind [the confidentiality] protection"), *cert. denied*, 469 *U.S.* 1193, 105 *S.Ct.* 971, 83 *L.Ed.2d* 974 (1985).

## C.

The ACJC contends that the potential disclosure of confidential material would have a chilling effect on its investigations, thus depriving it of the flexibility necessary to fulfill its responsibilities. Indeed, "confidentiality is thought to encourage ... the willing participation of relevant witnesses by providing protection against possible retaliation or recrimination." *Landmark Commc'ns, Inc. v. Virginia*, 435 *U.S.* 829, 835, 98 *S.Ct.* 1535, 1539, 56 *L.Ed.2d* 1, 8

(1978). We recently noted, in the separate setting of attorney discipline, that although disclosure can "invite the exertion of outside [coercive] influence," *R.M. v. Supreme Court of New Jersey,* 185 *N.J.* 208, 226, 883 *A.*2d 369 (2005), such speculative ill effects deserve a much more discerning inquiry. *Ibid.* Judges are under a duty to cooperate with an ACJC investigation. *See R.* 2:15-7. The ACJC also has other tools to ensure witness cooperation, such as subpoenas and criminal sanctions for witness tampering. It is not apparent to us that the ACJC's very ability to perform its investigations depends on our shielding of its investigator from testifying under subpoena in a criminal trial that concerns the same subject matter as our judicial disciplinary investigation.

That said, confidentiality during the ACJC's investigatory process serves to protect judges from unfair allegations that may never lead to formal disciplinary charges against the judge. Such protections prevent untested accusations from affecting a judge's career until the judge has had "a chance fairly to meet them." *Alvino, supra,* 100 *N.J.* at 103, 494 *A.*2d 1014; *see also Landmark Commc'ns, Inc., supra,* 435 *U.S.* at 835, 98 *S.Ct.* at 1539, 56 *L.Ed.*2d at 8 ("[U]ntil the time when the meritorious can be separated from the frivolous complaints, the confidentiality of the proceedings protects judges from the injury which might result from publication of unexamined and unwarranted complaints."). In fashioning the confidential period of investigatory review, however, we did not intend to craft a rule "designed to provide confidentiality to acts discovered through disciplinary investigations when those acts amount to potential criminal conduct." *Stroger, supra,* 97 *N.J.* at 410, 478 *A.*2d 1175 (quoting *State v. Stroger,* 185 *N.J.Super.* 124, 132, 447 *A.*2d 598 (L.Div.1981) in respect of criminal acts by attorneys).

The reason for maintaining confidentiality during the investigatory process is to preserve a basic fairness that is in keeping with the early stage of the ACJC's review. That concern militates in favor of giving a judge the opportunity to answer charges and

persuade the ACJC of their unfounded nature before the accusations become part of the public domain. *See Alvino, supra,* 100 *N.J.* at 105–06, 494 *A.2d* 1014. In this matter, however, other interests also must weigh in the balance. *Id.* at 106, 494 A.2d 1014. The concern about prevention of "reputational injuries" evaporates once a grand jury has handed up an indictment. Reputation injuries no longer can be avoided through maintenance of ACJC confidentiality in light of the public nature of the grand jury indictment and the specter of the upcoming public trial of Clark and his co-defendants. Plainly, our concern for a judge's reputation has been overridden by the very public, criminal charges preferred against Clark for the same conduct.

 Finally, judicial independence and public confidence are the two additional, and important, goals advanced by our current system of judicial discipline. *See In re Seaman,* 133 *N.J.* 67, 96, 627 *A.2d* 106 (1993). We have a constitutional duty to oversee the courts of this State, including the serious responsibility of removing judges from office when cause for such action is present. *N.J. Const.* art. VI, § 2, ¶ 3; *N.J. Const.* art. VI, § 6, ¶ 4; *see also Alvino, supra,* 100 *N.J.* at 106, 494 *A.2d* 1014. We cannot compromise, in the slightest, the integrity of the judicial process. *See In re Spitalnick,* 63 *N.J.* 429, 431, 308 *A.2d* 1 (1973). Thus, "the standard of judicial conduct is a high one precisely so that the integrity and independence of the judiciary may be preserved." *Seaman, supra,* 133 *N.J.* at 97, 627 *A.2d* 106 (quoting *In re Miera,* 426 *N.W.2d* 850, 855 (Minn.1988)).

Judicial misconduct "brings the office into disrepute and thereby prejudices the administration of justice." [2] *Ibid.* (quoting *In re Winton,* 350 *N.W.2d* 337, 340 (Minn.1984)). It also undermines respect for, and public confidence in, the judiciary. *Id.* at 96, 627

---

[2] Conversely, groundless claims against judges similarly can shake the public's confidence in the judicial branch. *See Landmark Commc'ns, Inc., supra,* 435 *U.S.* at 835, 98 *S.Ct.* at 1539, 56 *L.Ed.2d* at 8. After an indictment, however, we are no longer concerned about the public becoming aware of "groundless" complaints against judges.

A.2d 106. The balanced execution of ethical oversight duties is integral to protecting those interests. That includes the performance of this Court, as well as that of the ACJC. *See Alvino, supra,* 100 *N.J.* at 107, 494 *A.*2d 1014 (stating that "it is absolutely essential that the public have confidence in [the ACJC's] operation[,] and have good reason for that confidence"). It does not advance public confidence to have our disciplinary system operate in an overly secretive way. Where there is need for confidentiality, we are convinced that public understanding will follow. It asks too much of the public to insist on confidentiality when a compelling need for it no longer exists.

In light of this matter's present posture, where a judge has been indicted, the ACJC's need for flexibility—to conduct a thorough investigation that might result in the crafting of a remedy that might not necessitate a public hearing—has evaporated. The ACJC's investigation has been stayed until the criminal charges are resolved. The judge no longer has the option of retiring prior to a public hearing on his conduct. Indeed, this judge already has retired, but that action will not halt the trial. A public hearing in the court of law will occur regardless of the ACJC's actions. Further, the ACJC retains the power to subpoena witnesses, take depositions under oath, and demand the cooperation of attorneys and judges in future investigations. Such authority will enable the ACJC to perform its duties regardless of whether the particular judges and witnesses believe that criminal charges might be forthcoming.

Moreover, the worry that it is unfair to bring to light frivolous claims before a judge can respond is not present here. Because of the indictment, the public already has access to the fact that Clark has been charged with a crime. Thus, the ACJC's asserted interest in protecting the reputation of a judge whose ethics complaint has not been fully investigated has been superseded by the criminal justice system's needs in this instance.

We hold that the chief investigator of the ACJC must comply with the subpoena to testify in the public criminal trial at issue in

this matter.[3] Compliance with the subpoena, after an indictment has issued and a criminal trial is poised to commence, will not harm the ACJC's investigatory flexibility or risk unfairness to the judge involved. More importantly, however, the interests of respect for and public confidence in the judiciary require that public disclosure not be denied in this instance.

## IV.

For the reasons expressed herein, the judgment of the Appellate Division is affirmed. We dissolve the stay previously entered by this Court and remand to the Law Division for further proceedings.

*For affirmance and remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—6.

*Opposed*—None.

---

[3] In so holding, we express no view on whether Clark has any Fifth Amendment right against self-incrimination to assert in respect of his statements to the ACJC. *See DeVita v. Sills*, 422 *F*.2d 1172, 1177–80 (3d Cir.1970) (discussing judge's right against self-incrimination in judicial disciplinary proceedings). That issue has not been raised and, in any event, the record does not disclose whether Clark was aware of any criminal investigation at the time he was interviewed by Tonelli.